The **PAX COMPANY OF UTAH, a Utah corporation, Plaintiff-Appellee,**

**v.**

**UNITED STATES of America et al., Defendants-Appellants.**

**No: 643–70.**

United States Court of Appeals, Tenth Circuit.

Jan. 26, 1972.

■■■■■■■■■■■■■■■■■■■■■■■■

———◆———

Carl Eardley, Deputy Asst. Atty. Gen. (L. Patrick Gray, III, Asst. Atty. Gen., C. Nelson Day, U. S. Atty., Glenn J. Mecham, Asst. U. S. Atty., Ronald R. Glancz, Atty., Dept. of Justice, and R. Stanley Harsh and Harold M. Carter, Attys., Dept. of Agriculture, and C. Blaine Fielding, Atty., Environmental Protection Agency, of counsel, on the brief), for appellants.

I. Daniel Stewart, Jr., of Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah (Donald B. Holbrook, of Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, HILL and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This appeal on behalf of the government questions the validity of an injunction decree entered in the district court, 324 F.Supp. 1335, enjoining it from carrying out administrative proceedings which could cancel and bar the registration of certain weed and pest killers manufactured by appellee PAX. The government proceedings were taken pursuant to the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 135 et seq.[1]

Cancellation of the PAX registration would result in removal of their products from the domestic market which would be a very serious consequence. On the other hand, both before and since the injunction the company continues to manufacture and market these products and so the administrative process was not interfering, directly at least, with their business.

The products in question contain between 25 and 47 percent arsenic trioxide, and the government has determined that all products having a concentration in excess of 1.5 percent arsenic trioxide should not be available for sale on the home market.[2]

It started July 10, 1967, when PAX applied for renewal of registration for two of its products. Next, on July 18, 1969, two years later, the government notified PAX that Interpretation 25 (Note 2, *supra*) was to become effective and that this would result in denial of its application and would also result in denial of registration for three other PAX products. PAX proceeded to exercise its rights granted by statute, 7 U. S.C. § 135b(c).

1. The original action against the company was undertaken while the enforcement of the FIFRA was entrusted to the Department of Agriculture; such responsibility has since been transferred to the Administrator of the Environmental Protection Agency. See Reorg.Plan No. 3 of 1970, s. 2(a) (8) (i), U.S.Code Cong. & Adm.News, pp. 6322, 6324, 91st Cong., 2d Sess. (1970).

2. The policy involved is contained in Interpretation 25 which is reported in 7 C.F.R. 2762.123 first proposed November 25, 1967. It was promulgated as official policy on July 25, 1968, effective 90 days thereafter. This interpretation reads as follows:

§ 2762.123. Interpretation with respect to labeling of sodium arsenite or arsenic trioxide products.

(a) *Home use Unacceptable*. Labeling for economic poisons submitted in connection with registration under the Act bearing directions for use of products containing more than 2 percent sodium arsenite or more than 1.5 percent arsenic trioxide in or around the home is not acceptable.

(b) *Required warning against home use*. In addition to other warning and caution statements required by the regulations and interpretations under the Act, labels for such products with acceptable directions for agricultural, commercial, or industrial use must bear, in a prominent position, the warning statement(s) as indicated below:

(1) All products: "Do Not Use or Store in or Around the Home."

(2) Products intended for area treatments such as herbicide use: "Do Not Allow Domestic Animals to Graze Treated Areas." 34 F.R. 12081, July 18, 1969. Redesignated, 35 F.R. 19169, Dec. 18, 1970.

On August 18, 1969, it requested that the matter be referred to an advisory committee of experts selected by the National Academy of Sciences. Such a request under the appropriate regulations operates to suspend the date of cancellation until all proceedings are completed. PAX was informed on July 17, 1970, that the advisory committee had been formed on April 9, 1970, to review the issues. This committee was scheduled to begin meeting August 18, 1970. However, the district court issued its temporary restraining order August 17 and this brought the administrative proceedings to a halt.

The extensive administrative procedure is set forth in 7 U.S.C. § 135b(c) which in essence gives to the aggrieved party the right to ask for referral to an advisory committee or a public hearing or a submission to an advisory committee followed by a public hearing. At last, the aggrieved party may go to the Court of Appeals for the District of Columbia or the circuit wherein he resides or has his business. The record before the Department is then certified to the appellate court.[3]

As is already apparent, the prescribed procedure is lengthy and complex. Moreover, the proceedings taken to date on the part of the government have been unimpressively slow, deliberate and inconclusive. Over four years have passed since their inception. Considering then the failure of the government to move with dispatch in the light of the legal machinery provided, it is understandable that PAX sought injunctive relief, dis-

---

3. The various steps in the administrative procedure prescribed by 7 U.S.C. § 135b (c) are summarized as follows:

(1) A notification by letter to the applicant of failure to comply with the requirements of the Act.

(2) The applicant may make changes in the product so as to bring it within the Act's requirements; if he fails, the Secretary (now the EPA) refuses registration or cancels registration. He does so by

(3) Sending a letter notifying the applicant of the refusal or cancellation. The applicant has 30 days before cancellation becomes effective, in which time he may

(a) make the required changes

(b) request referral to an advisory committee (PAX's course)

(c) request a public hearing.

If he takes step (a), all is ended and the product will be registered. If he takes steps (b) or (c), cancellation is suspended until such time as the steps below are completed; in other words, the product remains on the market.

If he takes step (b), the Secretary submits to the advisory committee "forthwith" all relevant data before him, including the application for registration.

(4) Within 60 days after such submission to it, unless such period is extended by the Secretary for an additional 60 days, the committee submits a report and recommendation to the Secretary as to the registration of the article, together with reasons for its actions and the underlying data.

(5) Within 90 days after receipt of this report, the Secretary must make an order granting or denying registration, giving findings of fact.

(6) Within 60 days following the Secretary's order, the applicant may object and request a public hearing. This the Secretary must hold following due notice. The advisory committee report, recommendations and underlying data is made a part of the record of the public hearing.

(7) Within 90 days from the completion of the public hearing, the Secretary must again determine whether to register the product or not, and such determination must be based on substantial evidence of record at the hearing, and must include detailed findings of fact.

(8) Provision for judicial review of the administrative findings is set forth in section (d) of 7 U.S.C. § 135b; an aggrieved party may go to the Court of Appeals for the D.C. Circuit or the Circuit wherein he resides or has his principal place of business. The Secretary must file therein the record of the proceedings on which he based his order, including the report and recommendations of the advisory committee. The Secretary's order is upheld if it is supported by substantial evidence when considered on the record as whole. The Court of Appeals may order the Secretary to take additional evidence, may order a stay of the order pending its action, and is to expedite the disposition of all causes filed with it under the FIFRA.

covering as it did that the procedure was somewhat of an attrition mill. Nevertheless, we are not convinced that judicial intervention was justified since PAX was not injured, had not yet had an administrative hearing and thus might never have been hurt; further, if it had been hurt relief could have been sought in court. Moreover, the merits should be tried on the basis of the expertise prescribed by Congress.

The decision as to when, if at all, courts should interfere in the administrative process is itself a difficult one. A leading treatise on this subject has said that sometimes exhaustion of administrative proceedings is necessary and sometimes it is not.[4]

The Supreme Court has held that exhaustion is essential, but has not always required it.[5] It certainly is to be gleaned from the decisions, however, that courts ought not ordinarily to interfere with the administrative process in the absence of the most compelling reasons, and here there is no assurance from the proceedings taken and from those to be taken pursuant to the law that PAX will ultimately fail or that there will be a failure of justice. The Act after all provides for ultimate and orderly judicial review.[6] Furthermore, § 10(c) of the Administrative Procedure Act establishes a well defined procedure for judicial scrutiny of administrative proceedings which are not final when taken, and, as previously noted, the statute in question is careful, deliberate and protracted so that no product is cancelled unless there has been abundant and extensive due process. Also, while the administrative remedies are being pursued no action is taken which affects the product apart from the presence of the threat. Thus, while PAX initially maintained that the government intended to force its product off the market before the conclusion of administrative proceedings, counsel for the government now expressly disavow this intent and in their brief concede (as they must) that the statute forbids any such action.

The case at bar is different from the situation which obtained in Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), wherein the proposed standards promulgated by the F.C.C. were held to have had immediate detrimental effect on C.B.S. notwithstanding that they were not pressed into operation: it was shown that stations affiliated with the network withdrew in anticipation that the F.C.C. would not renew their licenses once the standards became effective. It was this extensive and actual harm that caused the judicial intervention in that case. The Supreme Court in the C.B.S. case said:

The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action

---

4. 3 Davis, Administrative Law Treatise, c. 20 (1958).

5. See Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938) : "So to hold would . . . in effect substitute the District Court for the Board as the tribunal to hear and determine what Congress declared the Board exclusively should hear and determine in the first instance. The contention is at war with *the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed*

*administrative remedy has been exhausted.*" (Emphasis added.) The court went on to note in a footnote that "The rule has been most frequently applied in equity where relief by injunction was sought." (*Id.*, n. 9).

But see Allen v. Grand Central Aircraft Co., 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1954) ; Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ; Toilet Goods Association v. Gardner, 360 F.2d 677 (2d Cir. 1966), aff'd, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

6. 7 U.S.C. § 135b(d).

taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control. (316 U.S. at 425, 62 S.Ct. at 1204).

A comparison of the conditions present in the C.B.S. case with the case at bar serves to point up that the problems which necessitated the injunction in the C.B.S. case are not suffered by PAX. After all, PAX continues to sell its product and the administrative proceedings have been so slow that proof of irreparable injury appears inconceivable.

The Secretary took more drastic action in Nor-Am Agricultural Products, Inc. v. Hardin, 435 F.2d 1151 (7th Cir. en banc, 1970). There the order of the Secretary was for suspension of registration of certain fungicides. Suspension of registration is an emergency procedure, employed by the Secretary when he determines that continued use of the questioned product (in *Nor-Am* certain mercury-containing compounds) would pose an imminent threat to health. After suspension the producers are entitled to go through the same procedures as are available to one whose registration is cancelled through the usual process, only on an "expedited" basis. The injunction was granted and was upheld by a panel of the 7th Circuit, but was finally denied by the Circuit en banc. The en banc court ruled that the emergency suspension was not final and that the damage suffered by *Nor-Am* did not justify the extraordinary remedy granted:

If this preliminary injunction were approved, other litigants could obtain district court threshold review by parroting plaintiffs' claim that the Secretary had acted arbitrarily and capriciously in suspending their registrations, even though Sections 4(c) and 4(d) specify that review shall only be in the courts of appeals after action by the advisory committee and then by the Secretary. We should not countenance such an evasion of the re-

view procedure provided by Congress in this statute. (435 F.2d at 1161).

Inasmuch as the completion of the administrative cycle in the present case could result in PAX's suffering no harm whatsoever, the reasons for refusing to short circuit the administrative process are the more compelling.

PAX finally argues that the process of having an advisory committee effectively finalizes the entire issue. We disagree with this contention and hold that the rules are not invalid on their face with one exception.

■ The regulations, at 7 C.F.R. 2764.11(e), authorize the assessment of costs of the advisory committee against a registrant requesting submission of the issues to the committee unless the committee rules in favor of the registrant. The statute specifically allows such a course:

Members of an advisory committee shall receive as compensation for their services a reasonable per diem, which the Secretary shall by rules and regulations prescribe, for time actually spent in the work of the committee, and shall in addition be reimbursed for their necessary travelling and subsistence expenses while so serving away from their places of residence, all of which costs may be assessed against the petitioner, unless the committee shall recommend in favor of the petitioner . . . . (7 U.S.C. § 135b(c).

PAX objects to being required to pay the members' per diem allowances as well as the other expenses, but it is our feeling that a reading of the statute clearly authorizes this imposition, an interpretation upheld by the legislative history of the provision. See U.S.Code Cong. & Adm.News, 88th Cong., 2d Session, 1964, p. 2169.

PAX also objects to subpart (3) of the above regulation, which reads:

An advance deposit shall be made in the amount of $2,500 to cover the

costs. Further advance deposits of $2,500 each shall be made upon request of the Administrator when necessary to prevent arrears in the payment of such costs. Any deposits in excess of actual expenses will be refunded to the depositor.

There is no statutory authorization for the advance imposition of costs. The statute merely provides that the respondent may be required to pay the costs. We do not question that the administrative body may implement statutes by reasonable regulations designed to carry out purposes of the Act, but the requirement of advance payment carries a connotation of presumption of guilt which we cannot approve, and undoubtedly PAX feels that it is being required to pay its funeral bill, so to speak, in advance of its death. Its apprehension is understandable.

Some of the other provisions of the regulation are not designed to quiet apprehensions. We cannot, however, see that they are likely to cause immediate harm; thus, after the administrative process has been completed, if the determination is adverse to PAX, and a full record has been developed so that the matter can be thoroughly and carefully reviewed on its merits, these provisions can more meaningfully be evaluated.

The other complaint is that the procedure is so interminable, but it would seem that it should now be carried out with some degree of celerity and precision. In sum then we do not find that the challenged regulations are void on their face with the single exception noted.

Accordingly, the judgment of the district court is reversed, and the cause is remanded with instructions to vacate the injunction and to dismiss the action, whereby the administrative process may proceed with dispatch.