The **DOW CHEMICAL COMPANY**,
Plaintiff-Appellee,

v.

William D. **RUCKELSHAUS**, Administrator Environmental Protection Agency, Defendant-Appellant.

No. 72-1441.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 9, 1973.

Decided April 19, 1973.

Michael C. Farrar, Environmental Protection Agency, Washington, D. C., for appellant.

Milton R. Wessel, New York City, for appellee.

Before MATTHES, Chief Judge, BRIGHT, Circuit Judge, and TALBOT SMITH.[*]

TALBOT SMITH, Senior District Judge.

The Dow Chemical Company (hereinafter Dow), aggrieved by an "Order and Findings of Fact of the Administrator Pursuant to Section 4(c), F.I.F.R.A.,"[1] sought mandamus[2] against William D. Ruckelshaus, Administrator, Environmental Protection Agency (hereinafter Administrator).

The litigation, of which this is only the most recent step, has had a lengthy and torturous history. It began back in 1970 (before the creation of the Environmental Protection Agency) when the Department of Agriculture[3] suspended immediately the registration of 2, 4, 5

---

[*] Hon. Talbot Smith, Senior United States District Judge, Eastern District of Michigan, sitting by designation.

[1.] Federal Insecticide, Fungicide and Rodenticide Act [FIFRA], 7 U.S.C. 135 et seq.

[2.] The action was brought under 28 U.S.C. § 1361, providing "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

[3.] The functions of Agriculture in this respect have been transferred to the Environmental Protection Agency. Reorg. Plan No. 3 of 1970, Sec. 2(a)(8)(i), U.S. Code Cong. and Admin.News, pp. 6322, 6324, 91st Cong., 2d Sess. (1970).

trichlorophenoxydcetic acid (a substance which will hereinafter be referred to as "2,4,5–T") for some uses and issued cancellation notices respecting others. Cancellation does not become effective until the Administrator issues his final order. In the meantime the registrant may ship and sell the questioned product. Suspension is a far more drastic action. "Although cancellation notices should issue as soon as the Secretary finds a substantial question concerning the safety of a registered product, he reserves the suspension power for cases in which serious and irreparable harm to the public health is likely to occur before the conclusion of the ordinary cancellation process." (Footnote omitted.) Wellford v. Ruckelshaus, 142 U.S.App.D.C. 88, 439 F.2d 598 (1971).

The Secretary's actions were taken because of evidence indicating "that 2,4,5–T, as well as its contaminant, dioxins, may produce abnormal development in unborn animals. Nearly pure 2,4,5–T was reported to cause birth defects when injected at high doses into experimental pregnant mice but not in rats. No data on humans are available."[4] An additional statement of the Department of Agriculture[5] described in detail the environmental impact, as well as stating that "The actions recommended for suspension and cancellation will minimize the probability of exposure of pregnant women to hazardous exposure of 2,4,5–T or contaminant dioxin around the home, in aquatic areas, and through food and water."[6]

The suspension orders were not contested, nor certain of the cancellation orders, but Dow did contest cancellation insofar as applied to use with relation to the production of rice, which brings us to the instant action.

A reference to the statutory framework is necessary for a delineation of the issues. FIFRA requires that all "economic poisons,"[7] commonly known as pesticides, marketed in interstate commerce be registered with the Environmental Protection Agency. To be registered a pesticide must meet certain safety and efficacy standards. It cannot be registered if its labeling renders it misbranded. Misbranding occurs when (among other situations) its labeling does not contain directions or warnings which, when followed, render its use non-injurious to man and other vertebrate animals, and useful invertebrate animals, and vegetation (except weeds, in the case of herbicides[8]). Under certain conditions, unnecessary to explore here, it cannot be registered at all.

The entire process of registration, cancellation, and suspension is governed by section 4 of the Act (7 U.S.C. 135 b). If "it does not appear" to the Administrator that the article in question, or its labeling, complies with the Act he may refuse registration (Section 4(c), 7 U.S.C. § 135b(c) hereafter Section 4(c)). He may also, suspend or cancel "Whenever it does not appear that the article or its labeling or other material required to be submitted complies with" provisions of the Act. Upon notification of cancellation of an existing registration the registrant has 30 days before the cancellation becomes effective. In this period he may either make the necessary corrections, may request a public hearing, or may request

---

4. April 15, 1970 announcement of U. S. Dept. of Agriculture, U. S. Dept. of the Interior, U. S. Dept. of Health, Education and Welfare.

5. U.S.D.A. Environmental Statement, undated, Exhibit D., Appendix Vol. I, p. 27.

6. Id., p. 29.

7. 7 U.S.C. § 135. For the purposes of sections 135–135k of this title—(a) The term "economic poison" means (1) any

substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any insects, rodents, nematodes, fungi, weeds, and other forms of plant or animal life or viruses, except viruses on or in living man or other animals, which the Secretary shall declare to be a pest, and (2) any substance or mixture of substances intended for use as a plant regulator, defoliant or desiccant.

8. 7 U.S.C. § 135(z)(2)(c), (d), (g).

referral to an Advisory Committee, which latter was Dow's course of action. This request has the effect of suspending the cancellation, with the result that the product remains on the market.[9]

The majority of the Advisory Committee recommended that the registrations in question be restored, with certain limitations. It also noted that "existing deficiencies in information relative to possible accumulation in the soil and possible magnification in the food chain of the dioxin TCDD be rectified by specific research directed to this end" and that "additional postregistration monitoring for adverse effects of agricultural chemicals be established," as well as "consideration of the applicability of new methodology that may be evolved for specialized testing, e. g., for carcinogenesis [cancer generating], mutagenesis [mutation generating] or teratogenesis [birth defect generating effects]." The dissent characterized the majority report as "overoptimistic in assessing the implications of data," spoke of the "uncertainty exist[ing] about the teratogenic potential of 2,4,5–T" and closed with the observation that "It is always difficult to make decisions in the face of uncertainty" and that the committee had "labored honestly and conscientiously to deduce the best recommendations from a confused aggregate of observations." [10]

After receipt of the committee report the Administrator, in a lengthy "Determination and Order" of August 6, 1971, published in 36 Fed.Reg. 14777, reviewed the past procedures and the committee report, concluding that "For the foregoing reasons I have determined to continue the order of cancellation for use of 2,4,5–T on food crops for human consumption." Dow asserted that the order did not comply with the requirements of Section 4(c), on the ground that it "was not the policy determination required by FIFRA" (since the record was regarded by the Administrator as incomplete) and that it "purported to order a public hearing" to gather further data, and that it did not "set forth the findings of facts" required by statute. Upon such grounds Dow filed a motion for what it regarded as appropriate relief.[11]

The Administrator, noting that "[n]either the FIFRA nor this Agency's rules make any provision for the type of relief requested by Dow" nevertheless treated Dow's motion as a "petition for reconsideration" of the August 6 order and ruled thereon. He stated, in part, that

"The basis for my August 6 determination to continue the order of cancellation previously issued was the many questions I had concerning the safety of and need for 2,4,5–T. Specifically, that action was mandated by the following facts." [12] (Here the Administrator listed the ten items found in full in fn. 14 hereof.)

Dow remained dissatisfied with the order and chose to "stand by" its previously filed objections. It next filed the present action in the Eastern District Court of Arkansas.

The Bill of Complaint prayed for injunctive and other relief, and that the Administrator be ordered to withdraw his August 6 and November 4 rulings, and to issue "a new and proper order," based and accompanied as described, and "in accordance with the recommendations of the Advisory Committee unless the Administrator can establish the existence of 'other data' which was not considered by the Advisory Committee and

9. See summary of statutory scheme in Pax Company of Utah v. United States, 454 F.2d 93 (fn. 3) (10th Cir. 1972) ; EDF v. Hardin, 138 U.S.App.D.C. 381, 428 F.2d 1093 (fn. 2–4) (1970).

10. P. 69, Exhibit Vol. I.

11. This motion requested withdrawal of the August 6 order and the entry of a new order complying with the statute. Dow at this time also, under protest, filed objections to the order and requested a hearing.

12. App. Vol. I pp. 93–95.

which would warrant reversal of the Advisory Committee's conclusions."

During argument in the District Court it was the suggestion of the Court that the Administrator enter an order ". . . as the statute requires of making findings from the Advisory Committee report and the conclusions then of the Administrator as to the decision that he makes and, therefore, the record can be put in the proper state, he can go ahead with the hearings as he intends . . ." [13]

Pursuant to the court's suggestion, and within the 30 days allowed, the Administrator issued an additional order under date of April 13, 1972. In this order the Administrator stated:

"It is my purpose in entering this amendatory order to state explicitly, within one document, my decision and findings of fact under section 4(c) of the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. 135b(c) to continue the cancellation of the registrations of 2,4,5-T' in question here after the submission of the Advisory Committee report. This order amends my orders of August 6, 1971 and November 4, 1971 in further response to the motion of the Dow Chemical Company filed October 1, 1971."

The new order continued with a review of the Advisory Committee report, stated the Administrator's determination that the cancellations of the registrations of 2,4,5-T be continued, made ten findings of fact, set forth in full in the margin hereof,[14] and concluded that "These facts made it abundantly clear to me that the registrants have not met their burden of proof, *i. e.*, their continuing obligation to establish the elements necessary to entitle their products to registration (see my Statement of March 18, 1971, at page 4). Accordingly the cancellations must be continued." (App. Vol. I, p. 173.)

With respect to this latest order, of April 13, the district court concluded

13. App. Vol. II (Transcript) p. 121.

14. "1. A contaminant of 2,4,5-T—tetrachlorodibenzoparadioxin (TCDD, or dioxin)—is one of the most teratogenic chemicals known. The registrants have not established that 1 part per million of this contaminant—or even 0.1 ppm—in 2,4,5-T does not pose a danger to the public health and safety.

2. There is a substantial possibility that even 'pure' 2,4,5-T is itself a hazard to man and the environment.

3. The dose-response curves for 2,4,5-T and dioxin have not been determined, and the possibility of 'no effect' levels for these chemicals is only a matter of conjecture at this time.

4. As with another well-known teratogen, thalidomide, the possibility exists that dioxin may be many times more potent in humans than in test animals (thalidomide was 60 times more dangerous to humans than to mice, and 700 times more dangerous than to hamsters; the usual margin of safety for humans is set at one-tenth the teratogenic level in test animals).

5. The registrants have not established that dioxin and 2,4,5-T do not accumulate in body tissues. If one or both does accumulate, even small doses could build up to dangerous levels within man and animals, and possibly in the food chain as well.

6. The question of whether there are other sources of dioxin in the environment has not been fully explored. Such other sources, when added to the amount of dioxin from 2,4,5-T, could result in a substantial total body burden for certain segments of the population.

7. The registrants have not established that there is no danger from dioxins other than TCDD, such as the hexa- and hepta-dioxin isomers, which also can be present in 2,4,5-T, and which are known to be teratogenic.

8. There is evidence that the polychlorophenols in 2,4,5-T may decompose into dioxin when exposed to high temperatures, such as might occur with incineration or even in the cooking of food.

9. Studies of medical records in Vietnam hospitals and clinics below the district capital level suggest a correlation between the spraying of 2,4,5-T defoliant and the incidence of birth defects.

10. The registrants have not established the need for 2,4,5-T in light of the above-mentioned risks. Benefits from 2,4,-5-T should be determined at a public hearing, but tentative studies by this agency have shown little necessity for those uses of 2,4,5-T which are now at issue."

that the Administrator had "failed to enter an order and findings of fact on the basis of the Advisory Committee's report and therefore abortive of the plain language of the statute." (App. Vol. I, p. 182.) The Administrator was further directed either to enter a new order and findings, or to amend his "purported order and findings entered on April 13, 1972 in accordance herewith," the new or amended order to (among other requirements):

"A. Set forth separately his findings of fact and his ultimate conclusions.

B. Include or be accompanied by a reasoned statement setting forth (i) the portions of the Advisory Committee Report and the 'other data' being relied upon; (ii) the manner in which defendant's findings are based upon the Advisory Committee Report and such 'other data'; and (iii) the manner in which defendant's ultimate conclusions are derived from the findings."

In addition it was directed that "While complying with this Order, defendant shall hold all administrative proceedings relating to 2,4,5–T in *status quo*." This appeal followed.

The Administrator's principal argument to us is that the District Court erred in enjoining the cancellation proceedings, that under the Act judicial review of the proceedings takes place only after the issuance of a final order, which this order was not, and then only in the Court of Appeals.

The statutory pattern respecting judicial review is set forth in Sections 4(c) and (d) of the Act. It is provided in Section 4(c) that

*Final* orders of the Administrator under this section shall be subject to judicial review, in accordance with the provisions of subsection (d) of this section. (Emphasis ours)

and in subsection (d), in part, that:

In a case of actual controversy as to the validity of any order under this

section, any person who will be adversely affected by such order may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit, within sixty days after the entry of such order, a petition praying that the order be set aside in whole or in part. . . . Upon the filing of such petition the court shall have *exclusive jurisdiction to affirm or set aside the order complained of in whole or in part.* (Emphasis ours)

■ These statutory provisions, taken together, provide for 1) a class of reviewable orders under Section 4(c), and 2) a delineation in 4(d) of the procedural aspects and standards of judicial review permitted by Section 4(c). Nor-Am Agricultural Products, Inc. v. Hardin, 435 F.2d 1151 (7th Cir., en banc, 1970). It is thus clear that only the final orders of the Administrator are reviewable, a conclusion supported by the legislative history of the Act, wherein Senator Ellender contrasted the old procedure with that contemplated by the Amendments under consideration:

"At present registration under protest provides a means by which an applicant for registration may appeal from a decision of the Secretary with which he disagrees. However, in order to take this appeal, he must take actions which subject him to penalties, the product to seizure, and the public to possible danger if the Secretary's determination should prove to be correct.

In lieu of this unsatisfactory type of appeal, the bill provides for administrative and judicial appeals. An applicant or registrant who disagrees with the Secretary's determination to refuse or cancel registration may request that the matter be referred *to an advisory committee which would consider the matter and make recommendations which the Secretary could*

*follow or not as he saw fit.* The bill also permits the applicant or registrant to file objections and request public hearings, either after the Secretary has received and acted upon the advisory committee's recommendations, or without having gone through the advisory committee procedure. *The hearing would be followed by a final order of the Secretary, which would then be subject to judicial review."* (Emphasis ours) [15]

The problem in the above lies in the content of the word "final." It has been held that under FIFRA a refusal to suspend is a final order, reviewable immediately, and that a failure to act for an appreciable time on a request for suspension was "tantamount to an order denying suspension" and likewise reviewable. EDF v. Hardin, 138 U.S.App.D.C. 381, 428 F.2d 1093 (1970). Similar result as to refusal to suspend was reached in EDF v. Ruckelshaus, *supra,* 142 U.S. App.D.C. 88, 439 F.2d 598 (1971), on the ground that such orders are "sufficiently final" in their impact to warrant judicial review. On the other hand, an order of suspension was found by the Seventh Circuit in Nor-Am Agricultural Products, Inc. v. Hardin, *supra,* to lack the necessary finality, since such order would always be followed by further administrative proceedings (dictum *contra* in EDF v. Ruckelshaus, *supra*).

But the above cited decisions relate to orders of suspension, summary action taken when necessary to prevent imminent hazard to the public. However, an order of cancellation (which we have before us) involves less urgent considerations. The product involved stays on the market. The elaborate procedures heretofore outlined are initiated and carried forward step by step with definite time limitations on each. Thus it is that "turning from suspension to the question of cancellation notices . . .

a decision of the Secretary to issue cancellation notices is not reviewable, because it merely sets in motion the administrative process that terminates in a reviewable final order." [16] A contrary holding at the District level is found in Pax Co. of Utah v. United States, 324 F.Supp. 1335 (D.Utah, 1970), based upon grounds such as that the Department (those of Agriculture) had not employed the procedures required by the Act, and that its actions were beyond its authority (and due process) because the grounds asserted were "legally insufficient." The Court of Appeals, however, reversed,[17] stating, in part, that:

" . . . [C]ourts ought not ordinarily to interfere with the administrative process in the absence of the most compelling reasons, and here there is no assurance from the proceedings taken and from those to be taken pursuant to the law that PAX will ultimately fail or that there will be a failure of justice. The Act after all provides for ultimate and orderly judicial review." (Footnote omitted) 454 F. 2d at 96.

The court also noted that the procedure before it was

" . . . careful, deliberate and protracted so that no product is cancelled unless there has been abundant and extensive due process. Also, while the administrative remedies are being pursued no action is taken which affects the product apart from the presence of the threat." 454 F.2d at 96.

Dow's answer to the above concerns principally its charge that the Administrator "has failed to perform his duty under FIFRA," that "there is nothing discretionary . . . about the Administrator's duty to make a decision" and, moreover, that there is required a "policy judgment and findings of fact" at the conclusion of Dow's first-stage administrative appeal. Thus, it is asserted, the

15. 109 Cong.Rec. 20079. See also Senator Ribicoff, 109 Cong.Rec. 20080; U.S. Code Cong. and Admin.News, pp. 2166, 2167, 2169, 88th Cong., 2d Sess. (1964).

16. EDF v. Ruckelshaus, *supra,* 439 F.2d p. 592.

17. Pax Co. of Utah v. United States, 454 F.2d 93 (10th Cir. 1972).

Administrator may be required by mandamus to perform his hitherto allegedly unperformed statutory duty.

In view of the fact that the Administrator has exercised his discretion in favor of cancellation, as hereinabove set forth, and has issued and re-issued ten reasons (denominated by him as 'his findings of fact) in support thereof, the charge made by Dow that he has failed in the performance of his duty evinces a construction of the statute at marked variance with that of the Administrator and one in complete disregard of the purpose of the Act and the burdens thereunder.

The basic error presented finds expression with respect to an early stage in the proceedings, i. e. when the Administrator received the report of the Advisory Committee. Dow argues that at this point "the Administrator had only two lawful options open to him," 1) to cancel Dow's registration if he believed that 2,4,5–T did not meet lawful safety standards, or, 2) to lift the original cancellation if he was without information sufficient to warrant cancellation. The rationale thus expressed does not accord with the Act. It goes back to the requirements of FIFRA prior to the 1964 amendment:—

"Prior to 1964, the FIFRA required the Secretary to register 'under protest' any pesticide or other item that failed to meet the statutory requirements. The product remained on the market, and the Secretary reported the violation to the United States Attorney for possible prosecution. In 1964 the statute was amended to eliminate the system of protest registration, and substitute the present administrative mechanism for cancelling registrations. The stated purpose of the amendment was to protect the public by removing from the market any product whose safety or effectiveness was doubted by the Secretary. *The legislative history supports the conclusion that Congress intended any substantial question of safety to trigger the issuance of cancellation no-*

*tices, shifting to the manufacturer the burden of proving the safety of his product.*[34] (Emphasis ours, other

34. See 110 Cong.Rec. 2948–49 (1964 (remarks of Congresswoman Sullivan) :

I am strongly in favor of the legislation now before you to require industry, rather than the Federal Government, to shoulder the burden of proof in connection with the marketing of pesticides which may be unsafe for use as intended.

\* \* \* \* \*

The burden of proof should not rest on the Government, because great damage can be done during the period the Govment is developing the data necessary to remove a product which should not be marketed.

See also H.R.Rep. No. 1125, *supra*; S. Rep. No. 573, 88th Cong., 2d Sess. (1964). Our construction of the FIFRA also finds strong suport in a 1969 report of the House Committee on Government Operations, reviewing the administration of the statute. The Committee strongly criticized the administrators for failing to take 'prompt or effective cancellation action in cases where it had reason to believe a registered product might be ineffective or potentially hazardous. . . . A mistaken belief that positive evidence of hazard—rather than simply a lack of adequate assurance of safety—is necessary to support a cancellation action appears to have been a factor in [the] failure to initiate such action in cases where it was obviously justified.' H.R. Rep. No. 91–637, 91st Cong., 1st Sess. 15–16 (1969)."

footnotes omitted) EDF v. Ruckelshaus, *supra*, 439 F.2d at 593.

 It is not in accord with the statute as amended that the Administrator may issue a cancellation order only and solely upon proofs that the substance involved does not meet the statutory standards evolved for the safety of the public. This, of course, he may do. But he is not so restricted. Since the registrant has a continuing burden of proof to establish that its product is entitled to registration, Southern Nat'l Mfg. Co. v. EPA, 470 F.2d 194 (8th Cir. 1972), if the Administrator has a substantial doubt as to safety, it is his duty as well to issue the cancellation order. And the cancellation order will remain

in effect until the registrant satisfies the Agency that registration is warranted.[18]

█ Such were the actions here taken. The Administrator, under dates of August 6, November 4, and April 13, has exercised the discretion committed to him by the Act and has continued in effect the cancellation order. In the August 6th order he questioned the adequacy of the record before him, particularly with respect to "the benefit coefficient of the cancellation equation," and although he did not use the word "findings" or spell out in detail more of his reasons therefor than the lack of adequate knowledge, his meaning was clear. He was not required to adopt the Advisory Committee findings. The November 6 order again continued the cancellation notices in effect and, in addition (but without using the word "findings") stated that his previous action was "mandated by the following facts," listing ten. On April 13th, following the District Court hearing, and at the court's suggestion, he sought to bring his previous order in conformity with the Court's thoughts thereon by stating ". . . explicitly, within one document, my decision and findings of fact under Section 4(c)", then repeating the ten statements of fact which were contained in the November 4 order.

The April 13th order, however, received no better reception than its predecessors. Dow asserts that "the April 13 document added nothing to the two earlier orders, but merely consolidated them. All three documents add up to the same thing—a refusal to make a determination on the merits . . .". The Administrator, it is argued, has "failed to perform his duty under the statute."

We disagree. His duty at this point under Section 4(c) is to "make his determination and issue an order, with findings of fact, with respect to the registration." This he has done. He has issued his order and he has stated as his factual conclusions such matters as the teratogenicity of dioxin, the possibility that even "pure" 2,4,5–T is a hazard to man and the environment, that the registrants have not established that the dioxin and 2,4,5–T do not accumulate in body tissues, as well as other matters which we have set forth hereinabove. At this point in the proceedings before us the statute does not require that he adduce the evidentiary support for the findings thus made and the fact that he does not do so does not bespeak a failure to do his duty under the Act, though the registrant may in due course challenge each fact so found, and though, indeed, the Administrator may ultimately confess error as to one or more. The statute envisions that if the registrant disputes the findings he may request an evidentiary hearing and, in this respect, we think it completely unjustified on the record to argue, for whatever purpose it may seem to serve, that the Administrator himself has mandated or ordered any hearings in violation of the Act.[19]

The reason for the statutory framework is not difficult to comprehend. Without the full record contemplated by the statute for review of final orders a court is not in a position properly to evaluate the basic validity of such asserted facts as, for example, that first listed of the ten, namely: "A contaminant of 2,4,5–F—Tetrachlorodibenzoparadioxin (TCDD or dioxin)—is one of the most teratogenic [relating to birth defects] chemicals known" or to weigh its pro's and con's. All of this may be

---

18. 40 CFR 164.32, 37 Fed.Reg. 9481. EDF v. Ruckelshaus, *supra.*

19. With respect to the matter of a public hearing, the Administrator brings to our attention the Federal Environmental Pesticide Control Act of 1972 (the FEPCA), P.L. 92–516, 86 Stat. 973. Under the procedures of this Act the Administrator himself may now issue a notice of his intent to hold a hearing (resulting in a final order subject to judicial review) rather than to continue with cancellation proceedings. We do not have before us any issue as to the applicability of this Act to the present proceedings.

done in accordance with the statute, at a hearing preceded by the sharpening process of the Administrative prehearing.[20] But this is not yet a final order, thus clearly distinguishable from cases hereinabove cited, such as EDF v. Hardin, *supra,* and Wellford v. Ruckelshaus, *supra,* wherein elaboration of reasons in final orders were required for the purpose of adequate judicial review thereof.

 Under the view we have taken of the case it is unnecessary to elaborate on the exhaustion doctrine, its basic considerations being governed by what we have held. The prescribed administrative remedy is obviously not exhausted. Myers v. Bethlehem Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); Adams v. Federal Trade Commission, 296 F.2d 861 (8th Cir. 1961). We have before us no mistaken interpretation of the law by the Administrator, no failure of duty by the Administrator, there is abundant administrative remedy, and there is no irreparable injury to Dow. In fact, any injury to Dow (as in The *Pax* case, *supra*) is at the most indirect for, under the law, the cancellation orders have no effect on Dow's right to ship and market its product until the administrative cancellation process has been completed and the ultimate decision may not be adverse. We find nothing in Skinner and Eddy Corporation v. United States, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772 (1919), or Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) warranting a different result.

We here consider a recent and largely untested act, not without its ambiguities. We consider, as well, matters "as sensitive and fright-laden as cancer"[21] and birth defects. It is a situation of extreme complexity, interweaving economic pressures with the most basic considerations of human safety. In this situation the Act, wisely we think, contemplates no interlocutory judicial jousting which experience has taught us can go on for years.[22] It was the intent of the Congress that matters under the Act proceed expeditiously to a final order subject to judicial review and without judicial intervention prior thereto. Such is our ruling. We have, as yet, no final order within the contemplation of the Act.

We find the remaining issues raised by appellee to be without merit. The judgment of the District Court is reversed and the cause is remanded with instructions to vacate the injunction and dismiss the action.

---

20. 40 CFR 164.29.

21. EDF v. EPA, 150 U.S.App.D.C. 528, 465 F.2d 528 (1972).

22. E. g., Pax Co. of Utah v. United States, supra.