**CITIZENS AGAINST TOXIC SPRAYS, INC., et al., Plaintiffs,**

v.

**Bob BERGLAND, Secretary, United States Department of Agriculture, et al., Defendants,**

**Industrial Forestry Association, Defendant-Intervenor.**

**Civ. No. 76–438.**

United States District Court, District of Oregon.

March 7, 1977.

**912**

Bruce H. Anderson, Coons, Cole & Anderson, Eugene, Or., for plaintiffs.

Sidney I. Lezak, U.S. Atty., William B. Borgeson, Thomas C. Lee, Asst. U.S. Attys., Dist. of Oregon, Portland, Or., for defendants.

Manley B. Strayer, James P. Rogers, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for defendant-intervenor.

SKOPIL, District Judge:

The plaintiffs in this action seek declaratory and injunctive relief prohibiting the use of phenoxy herbicides by the United States Forest Service (Forest Service) in the Siuslaw National Forest. After abandoning other claims asserted earlier in this proceeding,[1] the plaintiffs now rely solely upon the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 et seq., and upon the Act for the Protection of Bald and Golden Eagles (Eagles Act), 16 U.S.C. §§ 668 et seq.

The NEPA claim primarily attacks the adequacy of the Environmental Impact Statement (EIS) prepared by the Forest Service on its vegetation management program in the Siuslaw National Forest. Specifically, the plaintiffs contend that the discussion of the environmental effects of phenoxy herbicides and the consideration of alternatives to their use do not satisfy the requirements of 42 U.S.C. §§ 4332(2)(C) and (H).[2] The most serious allegation is that the EIS fails to address adequately the substantial scientific controversy over the health hazards posed by these herbicides. A secondary NEPA issue is whether the Forest Service followed the statutory procedures for obtaining and considering the comments of other government agencies and of the public on the proposed EIS.

The claim under the Eagles Act is based on the theory that the use of phenoxy herbicides where eagles feed and nest tends to molest or disturb them and thus constitutes a prohibited "taking" of these birds.[3] Although the Eagles Act does not expressly confer a right of action upon private citizens, the plaintiffs ask this court to recognize an implied civil remedy for members of the public under the standards set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

PROCEDURAL STATUS OF THE CASE

Plaintiffs' motion for a temporary restraining order was denied on May 21, 1976. Before trial, the Industrial Forestry Association (IFA) was permitted to intervene as a party defendant. The trial on the merits, which was combined with a hearing on plaintiffs' motion for a preliminary injunction, took place in two segments during

---

1. Two of plaintiffs' claims were abandoned in their trial brief. One was based upon the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), as amended by the Federal Environmental Pesticide Control Act of 1972, 7 U.S.C. § 136j(a)(2)(G). The other was based upon alleged violations of state water pollution control regulations, as made applicable to the defendants through the Federal Water Pollution Control Act, 33 U.S.C. § 1323. The amended complaint also referred to the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528

et seq., but the plaintiffs elected not to pursue any claim under this Act.

2. For the text of these statutes, see page 921 infra. The amended complaint erroneously refers to subsection (G) instead of subsection (H), which now contains the provision on which the plaintiffs rely. Act of Aug. 9, 1975, Pub.L. No. 94–83, 89 Stat. 424.

3. The relevant portions of the Eagles Act are quoted in footnotes 96 and 97, page 938, *infra*.

June and August, 1976. An amended complaint was filed on July 14, 1976. The case has been under advisement since the completion of post-trial briefing.

Most of the testimony was submitted in the form of written witness statements,[4] with live testimony almost entirely limited to cross-examination and rebuttal. In addition to the testimony and the attachments to the written statements, I have considered as evidence the depositions of four defense witnesses,[5] the responses to the plaintiffs' three requests for admission,[6] Plaintiffs' Exhibits 1–14, and (except as otherwise indicated below) Defendants' Exhibits A through Q.[7]

A ruling has been reserved on defendants' motion for summary judgment (which is treated as directed at the amended complaint). This motion is now denied. A number of genuine issues of material fact exist.

Ruling has also been reserved (Tr. 235) on plaintiffs' objections to Defendants' Exhibits A, C, and P, as expressed in Mr. Anderson's letter of June 29, 1976. Defendants elected not to respond to those objections and did not attempt to authenticate these exhibits or establish their relevancy or materiality during the trial. The plaintiffs' objections to the admission of Defendants' Exhibits A, C, and P are therefore sustained.

## THE PARTIES

■ The plaintiffs are two environmental groups—Citizens Against Toxic Sprays, Inc. (CATS) and the Oregon Environmental Council, Inc. (OEC)—and a cooperative organization of forest workers called Hoedads, Inc. The testimony of Stevens Van Strum, Larry Williams, and Gerald Mackie establishes that members of each of the three plaintiffs are affected by the spraying of phenoxy herbicides because they live in or near the Siuslaw National Forest, work in the Forest, or use the Forest for recreational and other activities. The plaintiffs clearly have standing to sue under NEPA. See *Cady v. Morton*, 527 F.2d 786, 791 (9th Cir. 1975).

The defendants are the Secretary of the United States Department of Agriculture [8] and various officials of the Forest Service, ranging from the Chief Forester down through the District Rangers in the Siuslaw National Forest. The intervenor, IFA, is a nonprofit corporation whose members are engaged in the forest products industry within the Pacific Northwest. Many IFA members purchase timber from the Siuslaw National Forest.

## FACTUAL BACKGROUND
## THE PHENOXY HERBICIDES [9]

The phenoxy herbicides are a group of selective herbicides widely used in crop production and in the management of forests, rangelands, aquatic habitats, and industrial and urban sites. These herbicides, which are related to naturally-occurring plant growth regulators, kill plants by causing malfunctions in growth processes. They are useful primarily because of their selectivity: broad-leaved plants are generally susceptible, while most grasses, coniferous

---

4. All of the written statements considered are listed in Appendix A attached to this opinion.

5. Kendall N. Covert, John O. Hoffman, Dr. Logan A. Norris, and Thomas C. Turpin.

6. The responses may be found in the trial transcript for August 11, 1976. Tr. 235–237, 240–241.

7. Defendants' Exhibits A through P were submitted initially with defendants' memorandum in opposition to plaintiffs' motion for a temporary restraining order.

8. The amended complaint named· as a defendant Earl Butz. With the change in Presidential administrations, Bob Bergland has been substituted as a party defendant pursuant to Fed.R. Civ.P. 25(d)(1).

9. The chief sources of factual information contained in this section are the so-called "CAST Report" issued in February, 1975, by the Council for Agricultural Science and Technology (attached to, the statement of Professor Boysie E. Day); the Federal Register; and the testimony, with attachments, of Dr. Warren B. Crummett, John Davidson, Dr. Ralph T. Ross, and Dr. Theodor D. Sterling.

trees, and certain legumes are relatively resistant.

The phenoxy acids form a family of compounds having similar chemical and biological properties but differing in details that affect their activity on individual plants, their cost, and other characteristics. The ones presently in use as herbicides in the United States include 2,4-dichlorophenoxyacetic acid (2,4–D), 2,4,5-trichlorophenoxyacetic acid (2,4,5–T), 2–(2,4,5-trichlorophenoxy) propionic acid (2,4,5–TP or silvex), 2,4–DP or dichloroprop, mecoprop, 2,4–DB, 2,4–DEP, erbon, MCPA, and MCPB. Of the phenoxy herbicides, 2,4–D, 2,4,5–T, and silvex are used the most extensively. The amounts produced in the United States in 1971 were, respectively, 45 million, 6 million, and 3 million pounds, representing over 90 percent of all phenoxy production.

All herbicides derived from 2,4,5-trichlorophenol—including 2,4,5–T and silvex (but not 2,4–D)—contain a chemical contaminant formed in the manufacturing process known as 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD). TCDD is one of the most toxic chemicals known to man. Its presence and significance in phenoxy herbicides have become known only in recent years, although the herbicides themselves have been in use since the late 1940s. TCDD cannot be eliminated entirely from the products of 2,4,5-trichlorophenol. However, refinements in production methods have succeeded in reducing the level of TCDD from up to 80 parts per million (ppm) to less than 0.1 ppm.

The phenoxy herbicides have been the subject of scientific research for many years. From time to time attention has been focused on them because of outbreaks of skin eruptions known as chloracne among workers involved in their production. One such outbreak occurred in a Dow Chemical plant in 1964.

The concern over TCDD and the phenoxy herbicides has reached its current level, however, only since the late 1960s. Two significant events took place at that time. First, a mixture of 2,4–D and 2,4,5–T known as Agent Orange was used extensively in South Vietnam as a defoliant. Charges of resulting damage to human, animal, and plant life lead to a number of scientific studies of the effects of Agent Orange. Second, a study by the Bionetics Research Laboratories reported that 2,4,5–T caused teratogenic effects (birth defects) in mice and rats.

In late 1969 President Nixon's Science Advisor announced the Bionetics findings and reported that government actions would be taken to restrict the use of 2,4,5–T. Early the next year, hearings on the effects of 2,4,5–T on man and the environment commenced before the Subcommittee on Energy, Natural Resources, and the Environment of the United States Senate. On April 15, 1970, the Secretaries of Agriculture, Interior, and Health, Education, and Welfare announced *suspension* of the registration of 2,4,5–T for (1) all aquatic uses and (2) liquid formulations for home and recreational use. This announcement was followed on May 1, 1970, by a notice of *cancellation* of the registration of 2,4,5–T for (3) granular formulations for home and recreational use and (4) all uses on food crops intended for human consumption.[10]

Following these actions, Dow Chemical Co. and other registrants exercised their statutory rights by challenging the cancellation of registration as to rice (one of the major food crops treated with 2,4,5–T) and

---

**10.** Under the FIFRA statutory scheme in effect at the time, *suspension* of registration was a more drastic step than *cancellation*. Suspension was permitted upon a finding of imminent hazard to the public and could occur without advance notice to the registrant. Cancellation, on the other hand, became effective only thirty days after service of notice and could be delayed by a request for public hearing or referral to an advisory committee. If such a request was made, cancellation could not become final until after the hearing or the report of the advisory committee. 7 U.S.C. § 135b(c), as amended by Act of May 12, 1964, Pub.L. No. 88–305, § 3, 78 Stat. 190. The FIFRA scheme has since been replaced by the procedures set out in the Federal Environmental Pesticide Control Act of 1972, 7 U.S.C. §§ 136 et seq., Pub.L. No. 92–516, 86 Stat. 975, as amended by Act of Dec. 28, 1973, Pub.L.No. 93–205, 87 Stat. 903; and Act of Nov. 28, 1975, Pub.L. No. 94–140, 89 Stat. 754.

requesting referral to an advisory committee. While that committee was studying the problem, the regulation of pesticides was transferred from the United States Department of Agriculture (USDA) to the Environmental Protection Agency (EPA).[11]

On May 7, 1971, the nine-member advisory committee [12] submitted its report to the Administrator of the EPA. After evaluating the available information on 2,4,5–T and TCDD, the committee

"found that the data concerning the effects on human beings in exposed areas was inconclusive. It was thus necessary to extrapolate the animal data to man.

"Within this framework, the committee concluded that 'current patterns of usage of 2,4,5–T and its known fate in various compartments in the environment, including the plant and animal foods of man, are such that any accumulation might constitute a hazard to any aspect of human health is highly unlikely.' This conclusion, however, was accompanied by a caveat that the toxic contaminant TCDD could pose a problem to human health, although a level of 0.1 parts per million of TCDD in 2,4,5–T would probably be acceptable." 36 Fed.Reg. 14777 (1971).

The committee report recommended that use of 2,4,5–T be permitted on forests, rangelands, and rights-of-way under certain conditions, provided that a limit of 0.1 ppm be set on TCDD contamination of 2,4,5–T, that 2,4,5–T be applied no more often than once a year at any one site, and that 2,4,5–T be applied with proper caution to avoid human contact. The committee also recommended another review following further specific research on the bioaccumulation of TCDD. One committee member [13] dissented from the committee's conclusions.

On August 6, 1971, after considering the report of the advisory committee, the Administrator of the EPA issued an order continuing the cancellation of 2,4,5–T for use on food crops until completion of the public hearing process. 36 Fed.Reg. 14777 (1971). In response to Dow's objections to this order, the Administrator issued a further order on November 4, 1971, reaffirming the earlier order and stating that his action was mandated by the following facts:

"1. A contaminant of 2,4,5–T—tetrachlorodibenzoparadioxin (TCDD, or dioxin)—is one of the most teratogenic chemicals known. The registrants have not established that 1 part per million of this contaminant—or even 0.1 ppm—in 2,4,-5–T does not pose a danger to the public health and safety.

"2. There is a substantial possibility that even 'pure' 2,4,5–T is itself a hazard to man and the environment.

"3. The dose-response curves for 2,4,-5–T and dioxin have not been determined, and the possibility of 'no effect' levels for these chemicals is only a matter of conjecture at this time.

"4. As with another well-known teratogen, thalidomide, the possibility exists that dioxin may be many times more potent in humans than in test animals (thalidomide was 60 times more dangerous to humans than to mice, and 700 times more dangerous than to hamsters; the usual margin of safety for humans is set at one-tenth the teratogenic level in test animals).

"5. The registrants have not established that dioxin and 2,4,5–T do not accumulate in body tissues. If one or both does accumulate, even small doses could build up to dangerous levels within man and animals, and possibly in the food chain as well.

"6. The question of whether there are other sources of dioxin in the environment has not been fully explored. Such other sources, when added to the amount of dioxin from 2,4,5–T, could result in a

11. Reorg.Plan No. 3 of 1970, § 2(a)(8)(i), eff. Dec. 2, 1970, 35 Fed.Reg. 15623, 84 Stat. 2086.

12. Witnesses testifying in this case included three committee members: Professor Frank N. Dost, Professor Ted A. Loomis, and Dr. Theodor D. Sterling.

13. Dr. Theodor D. Sterling.

substantial total body burden for certain segments of the population.

"7. The registrants have not established that there is no danger from dioxins other than TCDD, such as the hexa- and hepta-dioxin isomers, which also can be present in 2,4,5–T, and which are known to be teratogenic.

"8. There is evidence that the polychlorophenols in 2,4,5–T may decompose into dioxin when exposed to high temperatures, such as might occur with incineration or even in the cooking of food.

"9. Studies of medical records in Vietnam hospitals and clinics below the district capital level suggest a correlation between the spraying of 2,4,5–T defoliant and the incidence of birth defects.

"10. The registrants have not established the need for 2,4,5–T in light of the above-mentioned risks. Benefits from 2,4,5–T should be determined at a public hearing, but tentative studies by this agency have shown little necessity for those uses of 2,4,5–T which are now at issue." *Dow Chemical Company v. Ruckelshaus,* 477 F.2d 1317, 1320–1321 & n.14 (8th Cir. 1973).

Dow then filed an action in the United States District Court for the Eastern District of Arkansas seeking injunctive and other relief against the Administrator's decision. At the suggestion of the court, the Administrator entered a further order on April 13, 1972, continuing the cancellation of registration and reiterating his earlier findings of fact. *Id.* The district court, concluding that the Administrator had not followed the procedures mandated by FIFRA, then enjoined further EPA proceedings against 2,4,5–T until entry of an order complying with FIFRA. *Id.* at 1321–1322. On appeal, the Eighth Circuit reversed on the ground that the Administrator had not yet entered a final order subject to judicial review. *Id.* at 1326.

With the Dow litigation terminated, the EPA resumed its administrative proceedings against 2,4,5–T. On July 19, 1973, the

Administrator issued a notice of intent to order a consolidated public hearing on *all* registered uses of 2,4,5–T (including use for rice) in April, 1974. 38 Fed.Reg. 19860 (1973). He further ordered that the following issues (in addition to the ten issues delineated in his orders of November 4, 1971, and April 13, 1972) be addressed by the hearing:

A. The health hazards to man and other animals which may be caused by 2,4,-5–T and TCDD, with emphasis on teratogenicity, other adverse reproductive effects, mutagenicity,[14] carcinogenicity,[15] sub-lethal chronic health effects, and delayed lethality from chronic, low-level exposure.

B. The extent of the health risk posed by 2,4,5–T and TCDD, including thermal generation of additional TCDD in the environment, persistence and bioaccumulation of 2,4,5–T and TCDD, avenues of human and animal exposure (such as aerial drift and water transport), accumulation of residues in the human food supply and in human and animal tissue, presence in 2,4,5–T of contaminants other than TCDD, other environmental sources of dioxins, current levels of dioxins in 2,4,5–T products, and current methods of manufacture of 2,4,5–T.

C. The necessity for the continuation of the registered uses of 2,4,5–T.

38 Fed.Reg. 19859–19860 (1973).

The start of the hearing was to be delayed to permit the EPA to complete an environmental and human monitoring project on the presence of TCDD in 2,4,5–T and the extent to which TCDD may adversely affect human and animal health. 38 Fed.Reg. 19860 (1973). Early in 1973 two Harvard researchers, Professor Matthew S. Meselson and Dr. Robert Baughman, had reported the development of a method for achieving accuracy in detecting TCDD in the part per trillion (ppt) range. The EPA monitoring program was intended

---

**14.** Tendency to induce genetic mutations.

**15.** Tendency to produce cancer.

to employ this refined analytical method. Although difficulties with the technique had become apparent by early 1974, an Administrative Law Judge refused a request by the EPA to delay the hearing beyond May, 1974. On May 10, 1974, however, the Administrator issued an order postponing the consolidated hearing until November 1, 1974, to permit the hearing to be expanded to all registered herbicides derived from 2,4,5-trichlorophenol, including silvex and erbon. 39 Fed.Reg. 17466 (1974).

The methodological problems in monitoring TCDD residues continued. EPA researchers found that their results were by no means conclusive, and only partly suggestive, because of various interferences. They concluded that solutions to these problems would be obtained "only after a long involved period of basic research investigation and idealization of instrumentation." [16] As a result of these difficulties, on June 24, 1974, the Administrator withdrew the notices of intent to hold hearing on all registered uses of 2,4,5–T and other herbicides derived from 2,4,5-trichlorophenol and further withdrew the order of cancellation insofar as it related to rice only. 39 Fed.Reg. 24049 (1974). The order left in effect the *suspension* of registration of 2,4,5–T for (1) all aquatic uses and (2) liquid formulations for home and recreational use and the *cancellation* of registration of 2,4,5–T for (3) granular formulations for home and recreational use and (4) all uses on food crops intended for human consumption except rice. *Id.* The stated reason for discontinuing administrative proceedings was the scientific unavailability of evidence which would largely determine their outcome. The Administrator reported that no date could be given for completion of the EPA's TCDD residue monitoring project and that, in fact, completion of the project might be two or more years away. 39 Fed.Reg. 24050 (1974).

Since the order of June 24, 1974, the EPA's monitoring project has continued. A Dioxin Planning Conference was held in July, 1974, with a final Dioxin Implementation Plan [17] issued in February, 1975. The Plan contemplated that emphasis would be placed initially upon refinement of analytical methodology, including modifications of existing cleanup procedures to eliminate interferences, and upon monitoring of TCDD in beef samples from cattle grazing in areas of high 2,4,5–T use. The monitoring was to be conducted under the aegis of a 2,4,5–T Ad Hoc Task Force consisting of representatives of EPA, USDA, the Environmental Defense Fund, and Dow Chemical. Although the monitoring program has not proceeded as quickly as was hoped, preliminary results have been announced by the participating laboratories at Harvard University, Wright State University, Dow Chemical, the University of Utah, and EPA's Research Triangle Park Laboratory.[18]

Apparently, EPA has not yet initiated proceedings for the reregistration of phenoxy herbicides under the new procedures established by the Federal Environmental Pesticide Control Act of 1972, as amended,[19] and the regulations promulgated thereunder.[20] Proceedings will undoubtedly be commenced in the near future.[21] In the

---

**16.** Memorandum of June 3, 1974, from Dr. Edward O. Oswald to Carroll Collier, attached to the Supplemental Statement of Dr. Ralph T. Ross.

**17.** A copy of the Plan is attached to the Preliminary Statement of Expected Testimony of Dr. Ralph T. Ross.

**18.** See Dr. Ross's memoranda of August 5, 1975 (attached to Statement of Dr. Theodor D. Sterling), and June 18, 1976 (attached to Preliminary Statement of Expected Testimony of Dr. Ralph T. Ross).

**19.** 7 U.S.C. §§ 136 *et seq.,* Pub.L. No. 92–516, 86 Stat. 975, as amended by Act of Dec. 28, 1973, Pub.L. No. 93–205, 87 Stat. 903; and Act of Nov. 28, 1975, Pub.L. No. 94–140, 89 Stat. 754.

**20.** 40 C.F.R. Part 162 (1975).

**21.** 7 U.S.C. § 136d(a)(1) requires the EPA Administrator to cancel the registration of any pesticide after five years unless the registrant requests that the registration be continued in effect. The Administrator may reregister the pesticide only if he determines that it will not cause unreasonable adverse effects on the envi-

meantime, renewed interest in TCDD and the phenoxy herbicides has been sparked by lawsuits such as this one [22] and by such events as the evacuation last year of an area in northern Italy following a chemical plant explosion which released a cloud of 2,4,5–trichlorophenol [23] and the recent discovery that a small amount of TCDD had been stored in eastern Oregon.

## FOREST MANAGEMENT PRACTICES IN THE SIUSLAW NATIONAL FOREST [24]

About four-fifths of the total amount of phenoxy herbicides used in the United States is applied to cropland and rangeland. However, the phenoxy herbicides—principally 2,4–D, 2,4,5–T, and silvex—have also played a vital role in the management of the nation's forests over the past twenty years. In 1972 approximately 278,905 acres of forest land were treated with 2,4–D, 189,517 acres with 2,4,5–T, 14,907 acres with 2,4–D and 2,4,5–T in combination with each other, several thousand acres with 2,4–D or 2,4,5–T in combination with other herbicides, and 1,073 acres with silvex.

The use of phenoxy herbicides in forestry, as elsewhere, is to discriminate between desired and undesired plants. The most important uses are in preparation of sites for reforestation and in release of young conifers from competing brush and weed trees. Because the competing woody plants are more susceptible to the phenoxy herbi-

cides at certain times than are the conifers, properly timed applications affect the undesired species without harming the conifers.

For site preparation, a high degree of control is needed and the herbicides used must kill most of the competing woody vegetation, with a minimum of resprouting. Often, spraying is followed by broadcast burning. The site can then be stocked with conifers. After two to three years a second application of herbicides may be required to release the young conifers from competing vegetation. The objective is not to kill all competitive vegetation, but to increase the amount of light reaching young conifers in the understory and decrease brush competition for soil moisture and nutrients. Given three to five years of improved light and moisture, young conifers on most sites will outgrow the herbicide-damaged brush and be permanently released. Usually, only one or two herbicide treatments are needed on any site over a 30- to 95-year forest rotation cycle.

Phenoxy herbicides are most frequently applied to forest lands in the form of aerial broadcast sprays, using helicopters. They may also be applied by fixed-wing aircraft, by ground sprays, or by individual plant treatment. Formulations used in the forest may be esters, emulsifiable acids, water- or oil-soluble amines, or wettable powders, but low volatile esters are by far the most widely used.[25] The basic formulation is further diluted for application as a liquid spray by a carrier such as oil, water, or oil-water emul-

ronment. 7 U.S.C. § 136a(c)(5). The five-year renewal requirement has been suspended, however, pending reregistration and classification of all pesticide products registered by the EPA prior to October 21, 1974. 40 C.F.R. §§ 162.-6(b)(5)(i), 162.43(f)(3)(1975). Although reregistration was initially to be accomplished by October 21, 1976, *id.*, the deadline has since been extended by a year. Act of Nov. 28, 1975, Pub.L. No. 94–140, § 4, 89 Stat. 754. In any case, reregistration applications are to be submitted in the interim only upon the request of the EPA. 40 C.F.R. §§ 162.42(h)(2), 162.-43(f)(1)(1975).

**22.** See, *e. g., Kelley v. Butz,* 404 F.Supp. 925 (W.D.Mich.1975); *State of Wisconsin v. Butz,* 389 F.Supp. 1065 (E.D.Wis.1975).

**23.** See Attachment C to Brief of Defendant IFA.

**24.** The facts contained in this section are derived primarily from the CAST Report; Defendants' Exhibits F, G, H, K, and Q; and the testimony, with attachments, of Dr. William H. Lawrence, Dr. Ronald E. Stewart, and Thomas C. Turpin.

**25.** Low volatile esters are used on at least 80 to 90 percent of all forest and range improvement spray projects.

sion. Rates of herbicide application for both aerial and ground broadcast treatments generally range from one-half to four pounds acid equivalent (ae) per acre, the most common rate being two pounds ae per acre. The volume of aerial spray required is dependent upon height and density of brush species and weed trees but has been standardized in most cases at ten gallons per acre. The specific phenoxy herbicides employed and the time and rate of application vary with the forest management needs of the particular forest to be treated.

In forests of the Pacific Northwest, 2,4–D and 2,4,5–T are used on approximately 75 percent of the acreage treated with herbicides each year. The choice of herbicidal treatment for a particular site is usually dictated by the two to four species that are predominant in the brushfield. Often 2,4–D and 2,4,5–T are combined in a 1:1 "brushkiller" mixture where a half dozen or more species are abundant in the plant community to be treated. For purposes of site preparation, the most effective treatment is during the early foliar period in the late spring when shrubs and weed trees reach their maximum susceptibility to herbicides. For release of young conifers, application is usually during the budbreak [26] or late foliar [27] periods when conifers are less susceptible than the competing vegetation.

The Siuslaw National Forest (the Forest) is located in Region 6 of the United States Forest Service, which includes National Forests within Oregon, Washington, and two counties in northern California. The Forest is in the Central Oregon Coast Range within an area south of Tillamook, north of Reedsport, and west of Corvallis and Eugene. It includes portions of Benton, Coos, Douglas, Lane, Lincoln, Polk, Til-

lamook, and Yamhill Counties, totalling approximately 620,000 acres. The land ownership pattern is a mixture of public and private, with river valley bottoms usually owned by local residents. The forest types are characteristic of Sitka spruce and western hemlock vegetation zones, with Douglas-fir predominant. The Forest includes four Ranger Districts: Hebo in the north, Waldport in the west central and Alsea in the east central area, and Mapleton in the south.

A combination of high rainfall, mild temperatures, relatively long growing season, and deep fertile soil within the Siuslaw National Forest permit development of some of the most productive forests in the world.[28] However, these same conditions are also conducive to development of an aggressive woody shrub and weed tree community. Successional patterns after fire or logging tend toward dense shrub communities, including such species as salmonberry, thimbleberry, vine maple, elderberry, and ceanothus, which are eventually overtopped by red alder or shade-tolerant conifers.

For at least twenty years, phenoxy herbicides have been used in the Forest for site preparation and release of Douglas-firs and, to a lesser extent, for minor control of noxious or poisonous plants and for maintenance of improvements. Two formulations are most frequently used: a brushkiller mixture of one pound ae 2,4–D and one pound ae 2,4,5–T per acre and a formulation of 2,4,5–T alone, usually at three pounds ae per acre. More acreage is treated with 2,4,5–T than with any other herbicide. Since 1974 the projected annual acreage to be sprayed by helicopter with 2,4–D and 2,4,5–T for site preparation and conifer release has been approximately one to two

26. Late winter or early spring, up to the time new growth on conifers reaches one inch in length. Oil is the preferred carrier at this time.

27. Mid-July to early August, after cessation of growth on conifers. Water or oil-in-water emulsions are generally used as the carrier.

28. The Forest yields about 2.4% of the timber produced each year from National Forests in Region 6 and about 11% of the timber from National Forests in Oregon.

percent of the total Forest acreage.[29] The average size of units contracted out for spraying during 1976 was 30 acres, with a range in size from 2 to 174 acres. Silvex is not used in the Forest at the present time.

## THE EISs FOR THE VEGETATION MANAGEMENT PROGRAM IN THE FOREST [30]

Three EISs covering the vegetation management program in the Siuslaw National Forest have been admitted into evidence as exhibits: the first covering the period from January 1, 1974, to July 1, 1975 (1974–75 EIS), the second covering the period from July 1, 1975, to June 30, 1976 (1975–76 EIS), and the third covering the period from July 1, 1976, to September 30, 1977 (1976–77 EIS). The 1976–77 EIS is now in force within the Forest, and its adequacy is the subject of plaintiffs' NEPA claim. The following paragraphs describe the manner in which each of the three EISs was developed and issued by the Forest Service.

In preparing for the 1974–75 EIS, a Regional Pesticide-Use Coordinating Committee (RPUCC) was appointed for Region 6. The RPUCC divided Region 6 into six zones for purposes of preparing separate EISs, with the Siskiyou, Siuslaw, and Umpqua National Forests designated as Zone VI.[31] Within Zone VI a zone team was organized to prepare a draft EIS for review by the RPUCC. Following this review, a draft EIS was made available to the Council on Environmental Quality (CEQ) and the public on October 12, 1973. A final EIS was issued on February 20, 1974, after receipt of comments from public agencies and other interested parties. The EIS consisted of the environmental statement itself and a separate supplement entitled "Herbicide Background Information—Vegetative Management Environmental Statement" (Defendants' Exhibit K). The Regional Forester approved the final EIS on April 9, 1974.

The 1975–76 EIS was prepared in the form of an addendum to the 1974–75 EIS and its supplement and was also directed at the Siskiyou, Siuslaw, and Umpqua National Forests. The new information included in the addendum related primarily to the control of drift and to 2,4,5–T and TCDD. The draft 1975–76 EIS was issued to CEQ and the public on January 10, 1975, and the final EIS on May 8, 1975. The Regional Forester approved the final EIS on June 18, 1975.

At the same time that it was decided that addenda to the prior EISs would be issued for 1975–76, it was also decided that a new approach would be adopted within Region 6 for EISs on the vegetation management programs from 1976–77 on. Instead of annual zone-wide EISs, a single region-wide no-year EIS would be prepared, with addenda to be issued thereafter containing only such specific additional information as might be needed. A special Task Force was appointed to supervise the drafting of the region-wide EIS. A preliminary draft EIS was circulated to all National Forests on March 14, 1975, a final draft EIS was made available to CEQ and the public on September 16, 1975, and the final EIS was issued on February 13, 1976. On April 12, 1976,

---

**29.** The respective EISs give the following projected figures:

| Date | 2,4-D & 2,4,5-T | Total Acres Sprayed 2,4,5-T | 2,4-D |
|------|------|------|------|
| 1/1/74-7/1/75 | 6,900 (1974) | 4,300 (1974) | 500 (1974) |
| | 6,500 (1975) | 1,250 (1975) | 400 (1975) |
| 7/1/75-6/30/76 | 9,100 | 4,300 | --- |
| 7/1/76-9/30/77 | 7,800 | 5,000 | 400 |

Several hundred additional acres are sprayed by helicopter with 2,4-D and/or 2,4,5-T in combination with other herbicides. The use of phenoxy herbicides in ground spraying and individual plant treatment is much more limited.

**30.** Facts recited in this section are derived from Defendants' Exhibits B, F, G, and H and from the testimony of David A. Graham, Lavell O. Stanger, and Thomas C. Turpin.

**31.** The Siskiyou National Forest includes portions of Coos, Curry, and Josephine Counties in Oregon and Siskiyou and Del Norte Counties in northern California. The Umpqua National Forest is located within Douglas, Jackson, and Lane Counties in Oregon.

the Regional Forester approved the final EIS. The 1976–77 EIS did not incorporate by reference the background supplement which had been used with the two previous EISs, although much of the same information was included in the EIS itself.

Each of the three EISs contains a description of projects planned within each National Forest for the period covered by the EIS, including acreages, chemicals, application rates, formulations, and maps. The final decision to treat a particular area is made, however, only after an on-the-ground examination by Ranger District personnel. This examination generally takes place some four to five months before spraying. A contract proposal is then prepared and advertised for bids. The actual spray program may vary somewhat in location and extent from that described in the EIS.

## THE NEPA CLAIM

The plaintiffs allege that the current EIS on the Siuslaw National Forest's vegetation management program does not satisfy the requirements of NEPA insofar as phenoxy herbicides are concerned. The plaintiffs rely upon two provisions of NEPA, 42 U.S.C. § 4332(2)(C) and § 4332(2)(H). These sections provide as follows:

"The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall—

. . . . .

"(C) include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment

and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

. . . . .

"(H) initiate and utilize ecological information in the planning and development of resource-oriented projects".

Although the amended complaint alleges violations of both subsections (C) and (H), the plaintiffs have drawn no distinctions between these subsections either in the evidence presented or in the briefs submitted to the court. The NEPA claim will therefore be treated as presenting a single question: is the 1976–77 EIS for the Siuslaw National Forest adequate with respect to phenoxy herbicides?

The plaintiffs attack the adequacy of the EIS on several grounds. Their allegations may be categorized as claims (1) that the discussion of the environmental effects of phenoxy herbicides is inadequate, (2) that the consideration of alternatives to their use is inadequate, and (3) that the Forest Service failed to follow the statutory procedures for obtaining and considering the comments of other government agencies and of the public on the proposed EIS. The most substantial of these claims is the first.

■ The federal courts have developed a large body of case law on the standards to

be applied in determining whether a federal agency has complied with the requirements of NEPA. The Ninth Circuit has declared that NEPA is essentially a procedural statute: its purpose is to assure that, by following the procedures that it prescribes, agencies will be fully aware of the impact of their decisions when they make them. The question, then, is whether an agency has observed the procedures required by law. *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974) (en banc). The prescribed procedures must be faithfully followed; grudging, pro forma compliance will not do. *Id.*

■ An EIS is adequate only if it serves substantially the two basic purposes for which it was designed. That is, it complies with NEPA only when

"its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974).

The guidelines for the preparation of EISs which have been promulgated by the CEQ [32] and by the Forest Service [33] provide more specific guidance for determining the adequacy of an EIS. See *id.* at 1282 n.7. The adequacy of any particular EIS necessarily depends, however, upon the facts and circumstances surrounding the proposed federal action to which it is directed. *Sierra Club v. Froehlke*, 534 F.2d 1289, 1299 (8th Cir. 1976); *Trout Unlimited, supra,* 509 F.2d at 1282–1283.

## A. ADEQUACY OF THE DISCUSSION OF ENVIRONMENTAL EFFECTS

■ The adequacy of an EIS must be determined through use of a rule of reason.

Thus, a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" is all that is required. *Id.* at 1283. In other words, the role of the court is not to substitute its judgment for that of the agency as to the environmental consequences of its actions but to determine whether the agency has taken a "hard look" at those consequences. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2731 n.21, 49 L.Ed.2d 576 (1976).

■ An EIS is not inadequate when it fails to discuss remote and highly speculative consequences. *Trout Unlimited, supra,* 509 F.2d at 1283. Nor will disagreement among experts about environmental consequences serve to invalidate an EIS. *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Further, it is not necessary that all environmental effects of the proposed action be known. *Cady v. Morton,* 527 F.2d 786, 796 (9th Cir. 1975).

■ It is necessary, however, that the EIS indicate the extent to which environmental effects are uncertain or unknown. *Sierra Club v. Froehlke, supra,* 534 F.2d at 1296; *Scientists' Institute for Public Information, Inc. v. AEC,* 156 U.S.App.D.C. 395, 481 F.2d 1079, 1092, 1098 (1973); *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275, 1280 n.11 (9th Cir. 1973). Where scientists disagree about possible adverse environmental effects, the EIS must inform decision-makers of "the full range of responsible opinion" on the environmental effects. *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 380, 463 F.2d 783, 787 (1971). Conclusory statements which do not refer to scientific or objective data supporting them do not satisfy NEPA's requirement for a "detailed" statement. *Trout Unlimited, supra,* 509 F.2d at 1284; *Natural Resources Defense Council, Inc. v. Grant,* 355 F.Supp. 280, 287 (E.D.N.

---

**32.** 40 C.F.R. Part 1500 (1976).

**33.** 39 Fed.Reg. 38244 (1974).

C.1973). See CEQ Guidelines, 40 C.F.R. §§ 1500.8(a)(1) and (b) (1976); Forest Service Guidelines, 39 Fed.Reg. 38251, § 8412.-2(3)(c) (1974).

The plaintiffs contend that the 1976–77 EIS inadequately discusses the effects of phenoxy herbicides upon (1) the forest ecosystem, including soil invertebrates, lichens and mosses, fungus diseases, and insects, (2) silviculture, (3) agricultural crops, and (4) human and animal health. Plaintiffs' briefs describe the basic categories of error and omission present in the EIS as follows:

"1. Failure to cite significant, relevant literature.

"2. Failure to discuss detrimental aspects of literature cited.

"3. Misinterpretation, sometimes to the point of falsification, of studies cited.

"4. Failure to address major factors and issues.

"5. Failure to acknowledge and discuss disagreement among experts on significant issues.

"6. Failure to perform studies and follow procedures which the EIS states will be conducted and followed.

"7. Failure to admit lack of knowledge on significant issues.

"8. Failure to adequately respond to comments received in criticism of draft EIS's.

"9. Relying upon scientifically inaccurate studies.

"10. Failure to document claims with studies." Plaintiffs' Reply to Defendants' Trial Brief, p. 59.

If true, these charges might well establish shortcomings rendering the EIS inadequate under the authorities cited above.

 The evidence presented by the plaintiffs has raised some questions regarding the adequacy of the 1976–77 EIS in the first, second, and third areas. Nevertheless, I find that the EIS has satisfied the requirement for a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" in

these areas. *Trout Unlimited, supra,* 509 F.2d at 1283.

## (1) The Forest Ecosystem

The claim that the EIS inadequately discusses the effects of phenoxy herbicides upon the forest ecosystem rests almost entirely upon the testimony of Professor William C. Denison, an Associate Professor in the Department of Botany and Plant Pathology and a member of the Faculty of Ecology at Oregon State University. Professor Denison specializes in the biology of fungi and the ecology of western coniferous forests, in particular Douglas-fir forests. He testified that information drawn from agricultural research suggests that long-term use of herbicides increases the incidence of insect pests and fungal disease, that effects of herbicides upon soil invertebrates should have been considered, and that the present state of knowledge about herbicides cannot eliminate the possibility that available nitrogen will be reduced because of direct toxicity to nitrogen-fixing lichens and that lichens may accumulate toxic herbicides which will be passed along in the food chain. Professor Denison concluded that the risk of long-term effects from herbicides upon the health and productivity of the forest environment is substantial. In addition to the shortcomings pointed out in Professor Denison's testimony, the plaintiffs claim that the EIS's discussion of the forest ecosystem is inadequate because potential synergistic effects associated with herbicides are not mentioned [34] and conclusions about the effects of herbicide on soil erosion are too sanguine.

The testimony of the plaintiffs' witnesses about potential effects of herbicides upon the forest ecosystem is not directed at phenoxy herbicides specifically, but at herbicides in general. The hazards suggested by these witnesses have not been substantiated at this point by scientific research. Under these circumstances, the supposed effects of phenoxy herbicides upon the forest ecosystem must be viewed as remote and speculative. Failure to discuss such environmental

34. See Direct and Rebuttal Testimony of Gerald Mackie, p. 2.

consequences does not render an EIS inadequate. *Trout Unlimited, supra,* 509 F.2d at 1283.

### (2) Silviculture

The plaintiffs claim that the discussion of silvicultural effects of phenoxy herbicides contained in the 1976–77 EIS is inadequate in two respects: (1) the value of alder (which is a target of the vegetation management program) is understated and (2) the damage caused to conifers by the program is not acknowledged.

Professor Arthur W. Galston, Gerald Mackie, and Stan E. Sherwood all testified to the value of alder as a supplier of nitrogen in the forest. Mr. Sherwood, who is engaged in the business of logging alder, also testified to the increasing value of alder in the production of pulp and paper and of quality furniture.[35] Two of the defendants' witnesses—Professor Michael Newton and Dr. Ronald E. Stewart—stated in response that alder is not necessary to maintain productivity within the Forest. Moreover, alder contributes nitrogen despite the herbicide program: alder is allowed to grow up to the time plantation release occurs and is not entirely eliminated even at that time.[36]

The 1976–77 EIS acknowledges the value of alder as a producer of nitrogen (1976–77 EIS, pp. 7, 8, 12, 62, 108). In the 1974–75 EIS, alder was discussed in some detail in response to the comments submitted by a private citizen (1974–75 EIS, pp. 82–86). I find no inadequacy in the EIS in this regard.

The plaintiffs point to two pieces of evidence in support of their claim that the spraying of herbicides damages conifers. The first is the Herbicide Use Evaluation Forms attached to the testimony of Thomas C. Turpin,[37] which show visible damage to

between 16% and 76% of Douglas-firs in six instances of herbicide treatment during 1975. The second is a 1961 research paper by H. Gratkowski (Plaintiffs' Exhibit 13), which found reduction in height growth of Douglas-firs during the first two-year period after spraying with 2,4–D and 2,4,5–T and also found heavy mortality of Douglas-firs when sprayed in midsummer before cessation of conifer growth with 2,4–D or 2,4,5–T using diesel oil in the carrier.

This evidence does not render the 1976–77 EIS inadequate. Although the EIS might have mentioned the results revealed by Herbicide Use Evaluation Forms from prior years, the record does not indicate that reference to those results was required. The six forms attached to Mr. Turpin's testimony indicate that damage to Douglas-firs was confined to categories 1 and 2 on a scale ranging up to 5. Very few Douglas-firs fell within category 2. The evidence does not establish that the damage which was sustained was permanent. Likewise, the Gratkowski paper was not so important that failure to refer to it makes the EIS inadequate. As a result of subsequent research, Douglas-firs are no longer sprayed before conifer growth has ceased.[38] Further, Gratkowski concluded in his paper that the growth inhibition caused by herbicide application would probably be more than compensated for by increased growth due to brush control.

### (3) Agricultural Crops

The 1976–77 EIS mentions in general terms that application of herbicides will adversely affect some nontarget plants, as well as the target vegetation (1976–77 EIS, pp. i, 70, 87). It does not, however, discuss in specific terms the potential hazard to agricultural crops in the vicinity of spray projects. The CAST Report indicates that the hazard is a serious one:

35. Statement of Professor Arthur W. Galston, pp. 2–3; Direct and Rebuttal Testimony of Gerald Mackie, pp. 9–10 and attachments; Statement of Stan E. Sherwood.

36. Statement of Professor Michael Newton, pp. 3–5; Statement of Dr. Ronald E. Stewart, pp. 11–15.

37. Appendix B to Statement of Thomas C. Turpin. Instructions for use of the form may be found in the 1976–77 EIS at page B–15.

38. Appendix F to Statement of Thomas C. Turpin, pp. 21–25.

"The most serious hazard in the use of the phenoxy herbicides is drift of the chemical to nontarget vegetation during or after application. Phenoxy herbicides are extremely toxic to cotton and grapes. Beans, tomatoes, melons and many ornamental plants are also easily damaged. The hazard is related to the susceptibility of the plants, their stage of development and whether they are actively growing or not. Other factors are the distance from treated areas to susceptible plants, the amount of herbicide applied on a given day and the nature of the herbicide formulation used. The proportion of driftable small drops in the emitted spray and the height of the application (air or by ground) above the surface also affect spray drift. Wind velocity and direction and the degreee [sic] of turbulent mixing can greatly increase or decrease downwind transport and deposition of the spray in the susceptible crop area. Air temperature and humidity alter crop response and affect spray evaporation.

.　　.　　.　　.　　.

"With use of the best available technology, it is routinely possible to deposit 97 to 99 percent of the released spray within ordinary target areas by either aircraft or ground equipment. . . .

"In hazardous situations, phenoxy herbicides should be applied only when a positive and firm wind is blowing away from nearby susceptible crops. . . .

"A final means of protecting from drift is to recognize situations that are beyond normal protective measures and not spray at all. When highly susceptible crops such as cotton and grapes are grown within 3 to 5 miles of large-scale spray operations (over 100 acres per day), crop injury may occur despite normal precautions." CAST Report (attached to the Statement of Professor Boysie E. Day), pp. 14–15.

Professor Boysie E. Day further testified that he has seen harm caused to crops fifteen miles away and cases of negligent application causing harm even farther away. Tr. 100.

Potential effects of phenoxy herbicides upon agricultural crops are obviously of importance in an area such as the Siuslaw National Forest, where public and private land ownership are intermixed. At least one family has sustained severe damage to tomatoes, beans, melons, and grapes in their garden shortly after the Forest Service sprayed adjoining land in the summer of 1975.[39] The 1976–77 EIS should have discussed these potential consequences of the phenoxy herbicide spray program.

If this deficiency in the EIS stood alone, it would probably not be sufficient to justify a finding of inadequacy. Courts are not to "fly speck" environmental impact statements. *Lathan v. Brinegar, supra,* 506 F.2d at 693. The 1976–77 EIS is clearly inadequate, however, in its discussion of another subject: the effects of phenoxy herbicides upon human and animal health.

### (4) Human and Animal Health

Discussion of the effects of 2,4–D, 2,4,5–T, and TCDD upon humans, animals, and aquatic organisms in the forest may be found at pages 23–33, 58, 60–61, 63–64, and 80–81 of the 1976–77 EIS.[40] The effects of TCDD itself are mentioned only at pages 32–33, 61, 63, and 81. In addition, pages 106–107, 109, 115, and 125 contain references to the phenoxy herbicides or TCDD in responses by the Forest Service to comments of individuals who had reviewed the draft EIS.

The environmental impact upon health of the vegetation management program proposed in the 1976–77 EIS is summarized as follows:

"3. There will be no significant hazard to domestic or wild animals that may

---

39. Statement of Stevens and Carolyn Van Strum, pp. 5–7.

40. Since silvex is not used in the Siuslaw National Forest, the determination of the adequacy of the EIS will focus solely on its discussion of the effects of 2,4–D, 2,4,5–T, and TCDD.

graze treated areas, when recommended application rates are used.

. . .

"5. There is no evidence that the herbicide treatments will significantly affect aquatic life. Rigid application controls will keep herbicide levels in water well below toxic levels. Water analyses following herbicide treatments on forest lands in the past have shown water contamination from herbicide use to be negligible.

"6. The impact of the herbicide use on man is highly variable and depends upon the philosophy, convictions and values of the individuals and groups involved. No Forest personnel, herbicide applicators, or local Forest residents have incurred known health problems attributable to the use of herbicides during the past two decades. Dead vegetation results in short-term aesthetic deterioration of treated tracts." 1976–77 EIS, p. ii.

The EIS contains seven pages of tables on the acute and chronic toxicity of 2,4–D and 2,4,5–T (pp. 24–30). On carcinogenicity, it notes one researcher's suggestion that 2,4–D and 2,4,5–T "need more testing but the priority for testing is not high in comparison with some other pesticides" (p. 31). On mutagenicity, the EIS states that 2,4–D and 2,4,5–T "have mutagenic potential as demonstrated in tests with several plant systems" but concludes that "[t]he likelihood of significant mutagenesis occurring from normal use of phenoxy herbicides is small" (p. 31). The EIS acknowledges the Bionetics findings on teratogenicity in rats and mice and the findings of other researchers on teratogenicity in chicks, but suggests that the validity of those findings may be questioned for various reasons (pp. 31, 23). The EIS also cites the finding of the Advisory Committee on 2,4,5–T [41] that much of the general toxicity attributed to 2,4,5–T has been caused by TCDD (p. 32), concluding that this contamination presents no problem under current methods of production (pp. 32–33). With respect to aquat-

ic organisms and wildlife, the EIS finds little evidence of hazard from the phenoxy herbicides or TCDD (pp. 60–61, 63–64). Finally, with respect to man, the EIS concludes that the proposed herbicide use programs present "a minimal hazard", with the "greatest potential hazard . . . from [skin absorption, oral ingestion, or inhalation of] the concentrated chemicals" by persons applying them (p. 79). The EIS further notes that "there are very few reports of tests or incidents of poisoning of man by these compounds. The majority of available reports of poisoning refer to accidental poisoning of children." (p. 80).

The plaintiffs claim that this discussion of the hazards to human and animal health posed by the phenoxy herbicides and particularly TCDD is not adequate under the standards established by NEPA. After thoroughly considering the evidence presented in this case, I am in complete agreement with the plaintiffs. Before turning to the specific evidence which convinces me that NEPA has been violated, however, I wish to remark upon some of the arguments advanced in defense of the EIS.

■ The defendants contend that the plaintiffs are litigating their claims "at the wrong time, in the wrong case, and against the wrong defendants" (Defendants' Reply and Trial Memorandum, p. 34). That is, the defendants assert that the plaintiffs seek a finding that phenoxy herbicides are unsafe: a finding that can and should be made only by the EPA in the performance of its statutory duties, subject to judicial review in an appropriate proceeding. Because the defendants have taken this position, they objected at trial on the ground of irrelevancy to the introduction of any evidence on the safety of the phenoxy herbicides or TCDD. Their objections were overruled.

The overruling of the defendants' objections is easily explained. The question before me is not whether phenoxy herbicides are safe or whether I would permit their use in the Siuslaw National Forest were that decision entrusted to me. The ques-

41. See pages 914–916, *supra*.

tion, rather, is whether the 1976–77 EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the herbicide management program. *Trout Unlimited, supra,* 509 F.2d at 1283. In other words, does the form, content, and preparation of the EIS substantially "(1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact"? *Id.* The answer to that question can only be determined by considering the present state of scientific knowledge and opinion about the phenoxy herbicides and TCDD. Evidence on that issue is clearly relevant.

Nor can the Forest Service avoid its obligations under NEPA by arguing that any necessary scientific inquiry must be conducted by the EPA. NEPA mandates a case-by-case balancing judgment on the part of federal agencies. The only agency in a position to make such a judgment in a particular case is "the agency with overall responsibility for the proposed federal action—the agency to which NEPA is specifically directed". *Calvert Cliffs' Coordinating Committee, Inc. v. AEC,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1123 (1971). The responsible agency may not attempt to abdicate to any other agency merely because that agency is authorized to develop and enforce environmental standards. *Id.* Thus, the mere fact that a program involves use of substances registered under FIFRA does not exempt the program from the requirements of NEPA. *Environmental Defense Fund v. Hardin,* 325 F.Supp. 1401, 1407 (D.D.C.1971). An agency cannot satisfy its NEPA obligations by obtaining from EPA a satisfactory rating of its EIS, as the Forest Service has done.[42]

No subject to be covered by an EIS can be more important than the potential effects of a federal program upon the health of human beings. The defects of the 1976–77 EIS in this area are substantial. Much information of vital interest to decision-makers and to the public has simply been omitted; in other instances, the information provided is either incomplete or misleading. The EIS does not indicate the extent to which effects of phenoxy herbicides are unknown or acknowledge the opinions of responsible scientists who counsel against their use. Moreover, many conclusory statements about the safety of phenoxy herbicides are unsupported by scientific or objective data.

This opinion will not attempt to summarize all the evidence which has been introduced on the potential effects of 2,4–D, 2,4,5–T, and TCDD upon human and animal health. The most glaring inadequacies of the 1976–77 EIS which have been revealed by the evidence are highlighted, however, in the following paragraphs.

The 1976–77 EIS nowhere acknowledges the extreme toxicity of TCDD or the opinions held by eminent scientists about its hazards. Professor Virgil C. Boekelheide, Professor of Organic Chemistry and Acting Head of the Department of Chemistry of the University of Oregon, testified that TCDD

"is fantastically toxic and is commonly quoted as being the most toxic simple organic molecule known to man. Its acute oral lethal toxicity ($LD_{50}$) in guinea pigs is 0.0000006g/kg. At sublethal dose levels it still has highly toxic effects on thymus, liver and other organs, as well as being extremely teratogenic. Thus, minute quantities of TCDD well below the acute lethal dose level have adverse toxic effects and a threshold limit, below which no toxic effects occur, has never been demonstrated for TCDD." [43] Statement of Professor Virgil C. Boekelheide, p. 2.

---

42. EPA's comments on the 1976–77 EIS were classified as LO–1 (LO = lack of objection, 1 = adequate information). 1976–77 EIS, pp. 124–125.

43. $LD_{50}$ is the dose of a chemical which is lethal to 50 percent of the test animals. Dose is usually stated in milligrams of chemical per

Professor Arthur W. Galston, Eaton Professor of Botany in the Department of Biology at Yale University, referred to TCDD as "one of the most poisonous chemicals ever synthesized by man" (Statement of Professor Arthur W. Galston, p. 2). He expressed the opinion that the fact of its teratogenicity

"raises the question of its possible carcinogenicity or mutagenicity, and means that the spread of this compound should be limited as much as possible until further investigations permit us to appraise the degree of danger caused by its massive introduction into the environment." Id. at p. 4.

Dr. Wilbur P. McNulty, Jr., Chairman of the Laboratory of Pathology at the Oregon Regional Primate Research Center, also testified to the extreme teratogenicity and acute and chronic toxicity of TCDD.[44] Dr. McNulty noted that upon learning how very potent TCDD is for rhesus monkeys, he had discontinued his laboratory experiments with them until he could construct a properly isolated facility.[45] It was his view that

"because the response of rhesus monkeys to TCDD is qualitatively quite different from those in laboratory rodents, and because human beings are biologically closely related to monkeys, . . . no laboratory results with TCDD can be safely extrapolated to human beings unless obtained with monkeys or apes.

"Unfortunately the available toxicological information for monkeys is very meagre; what little there is suggests a very high order of sensitivity. Until better information is available, it is my opinion that the deliberate environmental distribution of TCDD or products known to contain TCDD at any level causes a serious threat to human and animal health." Proposed Testimony of Dr. Wilbur P. McNulty, Jr., p. 6.

Professor George Streisinger, Professor of Biology and Research Associate in the University of Oregon's Institute of Molecular Biology, concluded based on existing scientific knowledge that the herbicide program used by the Forest Service in the Siuslaw National Forest "does pose a danger to the health of humans" (Proposed Testimony of Professor George Streisinger, p. 2). Using the level of lethality of TCDD to guinea pigs, Professor Streisinger gave the following example of the potential hazard to humans:

"If one considers the human $LD_{50}$ to be similar to the $LD_{50}$ of the most sensitive animal thus far tested (the guinea pig) the $LD_{50}$ for humans would be 30 $\mu g$ (based on the guinea pig $LD_{50}$ of 0.6 $\mu g$ per kg body weight and a human weight of 50 kg (110 lb). An ounce of pure dioxin would therefore contain about 800,000 lethal doses for humans." [46]

He continued:

"I would like to emphasize that the results of animal studies cannot be used as reliable predictors of sensitivity levels of humans. For example, humans are at least 100 times more sensitive to the teratogenic (birth-defect causing) drug thalidomide than are mice: it is clear that the danger of thalidomide would not have been predicted from mouse studies. There is no basis for concluding that humans may be ten times (or a hundred times) more resistant to dioxin than are guinea pigs, or ten times, (or a hundred times) more sensitive to dioxin than are guinea pigs." Id. at pp. 3–4.

Professor Streisinger also criticized the conclusions of the 1976–77 EIS with respect to potential mutagenic and carcinogenic effects of the phenoxy herbicides:

"Experiments performed in 1973 have demonstrated that persons engaged in the application of herbicides exhibit a marked increase in chromosomal abnor-

kilogram of body weight (mg/kg). CAST Report, p. 15.

**44.** Proposed Testimony of Dr. Wilbur P. McNulty, Jr., pp. 2–4.

**45.** Id. at page 5.

**46.** One thousand micrograms ($\mu g$) equal one milligram.

malities (Yoder et al. 1973). The EIS 1977 is grossly negligent in not pointing out this known association and in failing to indicate the likelihood of chromosomal damage in persons exposed to herbicides.

. . .

"The EIS is negligent in failing to emphasize the possible danger from mutagenic effects of the herbicides, especially in light of the evidence from the tests that have been performed in this area. The EIS in addition fails to indicate that herbicides that are mutagenic are likely to be carcinogenic as well: it has been shown that a large majority of chemicals tested that are mutagenic are also carcinogenic". Redirect and Rebuttal Testimony of Professor George Streisinger, pp. 10–11.

The testimony of Professor Arthur H. Westing, Professor of Botany at Windham College in Putney, Vermont, was similar to that of the foregoing scientists. Professor Westing concluded that

"until new developments alter the current situation the use of TCDD dioxin-contaminated herbicides presents an unacceptable risk to man and his environment." Statement of Professor Arthur H. Westing, pp. 8–9.

The failure of the 1976–77 EIS to acknowledge the existence of responsible scientific opinion about TCDD such as that expressed during the trial of this case would of itself render the EIS inadequate. In addition, however, several other major deficiencies in the EIS are apparent.

One obvious deficiency is the failure of the EIS to discuss, or even to mention, the history of the EPA administrative proceedings directed at 2,4,5–T and other herbicides containing TCDD.[47] A review of that history makes apparent the serious questions about the safety of those herbicides which remain unanswered.[48] Although the 1974–75 and 1975–76 EISs refer to the EPA proceedings,[49] the 1976–77 EIS completely ignores them. The 1976–77 EIS does not acknowledge either the fact that the proceedings were suspended only because of problems with analytical methodology or the fact that suspensions and cancellations of many uses of 2,4,5–T remain in effect.[50] Significantly, however, the current EIS does cite [51] the report of the Advisory Committee on 2,4,5–T, which made favorable findings about that herbicide,[52] while failing to mention that the EPA Administrator continued the cancellation of the registration of 2,4,5–T after receiving that report.[53]

A related deficiency in the 1976–77 EIS is its lack of any significant discussion of the ongoing TCDD residue monitoring program being conducted by the EPA.[54] The only place the Forest Service mentions the program in the 1976–77 EIS is in its response to a letter from Stevens and Carolyn Van Strum enclosing a copy of the August 5, 1975, EPA memorandum reporting interim results.[55] The Forest Service did not reproduce the memorandum in the EIS "[b]ecause this document was not intended to be published" (1976–77 EIS, p. 106). In answer to the Van Strums' concern that the memorandum reported TCDD residues in beef samples at a level that might be unsafe, the Forest Service wrote:

"The EPA memo reports only on interim results of the current residue monitoring

---

47. The history of those proceedings is outlined at pages 914–917, *supra.*

48. See, *e. g.,* the EPA Administrator's findings of fact in his order of November 4, 1971 (pages 915–916, *supra*) and the list of issues to be considered during the proposed EPA hearing (page 916, *supra*).

49. 1974–75 EIS, pp. 49, 70, 72, 95; 1975–76 EIS, pp. 19, 22. The discussion in those EISs is by no means complete or even entirely accurate.

50. See page 917, *supra.*

51. 1976–77 EIS, pp. 31–32, 81.

52. See pages 914–915, *supra.*

53. See page 915, *supra.*

54. See page 915, *supra.*

55. The letter from the Van Strums is reproduced (without the enclosure) at pages D–5 to D–8 of the EIS. The Forest Service's response is found at pages 106–107.

program. It relates mainly to the pioneering analytical methodology being explored for determining 2,4,5–T/TCDD residue levels at the parts per trillion level. This report does not detail experimental procedures used nor differentiate between actual samples and controls (checks). Some levels of TCDD found to date are given but no definite conclusions are reached and recommendations, for or against the continued use of 2,4,5–T were not made." 1976–77 EIS, p. 107.

The memorandum itself was introduced into the record in this case as an attachment to the direct testimony of Dr. Theodor D. Sterling. The memorandum, written by Dr. Ralph T. Ross (then Dioxin Program Coordinator), reported that one-third of the beef fat samples collected from cattle rangeland treated with 2,4,5–T had been analyzed, with the following results:

"Approximately half of the 34 samples analyzed show positive residue data for TCDD by one or more of the participating analytical laboratories. Dioxin residue levels varied from no detection to approximately 110 parts per trillion. Substantial numbers of the samples containing dioxin showed levels ranging from 50–60 parts per trillion." Attach-

ment to Statement of Dr. Theodor D. Sterling, pp. 2–3.

Dr. Ross concluded:

"Studies including teratogenic and other toxicity effects indicate that the residue levels mentioned above may present a health hazard to man based on the application of normal margins of safety." *Id.* at p. 3.

Because analysis of the remaining samples would not be completed until mid-September, 1975, Dr. Ross recommended that a final decision on the registration of herbicides containing TCDD be delayed until then. *Id.* In light of this memorandum, the failure of the 1976–77 EIS to discuss the EPA monitoring program in greater detail is inexplicable.[56]

The trial in this case brought to light the fact that TCDD residues had been found by the EPA in samples of animal tissue taken in 1973–74 from areas in the Siuslaw National Forest which had recently been sprayed with 2,4,5–T. This fact is never mentioned in the 1976–77 EIS, even though the 1974–75 EIS had acknowledged that the Forest was participating in the study.[57] The record[58] reveals that the EPA collected a number of animal specimens from Pacific Northwest forests, Virginia rights-of-way,

**56.** Another interim report of the results of the EPA program was issued late in 1975 but has not been introduced into the record. Other evidence which has been introduced makes clear, however, that the preliminary results were significant. A memorandum from Dr. Ross dated June 18, 1976 (attached to the Preliminary Statement of Expected Testimony of Dr. Ralph T. Ross), reports partial final results showing one beef fat sample with a TCDD level of 60 ppt, two samples with levels at 20 ppt, and five samples which might have TCDD levels ranging from 5–10 ppt. See also the testimony of Dr. Patrick W. O'Keefe (Research Fellow in Biology at Harvard University and a participant in the EPA monitoring program), Tr. 28–34. Approximately 20 percent of the 85 samples of beef fat which were analyzed were controls from cattle grazing on untreated rangeland. Of the initial 85 samples scanned by low resolution mass spectrometry, some 15 to 18 were rerun by high resolution mass spectrometry either because they showed levels of TCDD or for other reasons. Some samples

showing TCDD at low resolution may not have been rerun at high resolution because of depletion of the sample material. The results reported in Dr. Ross's memorandum of June 18, 1976, were from the 15 to 18 samples which had been rerun. (Testimony of Dr. Ralph T. Ross, at Tr. 276–280)

**57.** 1974–75 EIS, p. 70.

**58.** The results of the TCDD analysis of samples from the Siuslaw National Forest are found in Plaintiffs' Exhibit 1 (those samples marked "Hebo" or "Walport" [*sic*]). Plaintiffs' Exhibit 3 contains correspondence and other information about the collection of the samples. Witnesses who testified about the analysis of these animal specimens included Dr. Patrick W. O'Keefe (Tr. 34–38, 219–220; Supplementary Testimony of Dr. Patrick W. O'Keefe; Tr. 379–382), Dr. Logan A. Norris (Deposition of Dr. Logan A. Norris, pp. 28–39), and Dr. Ralph T. Ross (Tr. 263–267, 275, 281–283).

and other areas during 1973 and 1974 to determine whether TCDD had accumulated in their tissues. The EPA laboratory in Prine, Florida, analyzed the specimens early in 1974 and obtained some positive results. Positive TCDD levels detected in specimens from the Siuslaw National Forest included readings of 83 and 133 ppt in wrens, 13 ppt in a Stellers jay, and 14 and 14 ppt in deer mice. TCDD was also found in three specimens from other Pacific Northwest forests and in several shrews, deer mice, and birds from the Virginia rights-of-way (two shrew samples showed TCDD levels just below 400 ppt). The EPA reported these results at the Dioxin Planning Conference held in July, 1974, but did not consider them confirmed because of the problems which then existed with analytical techniques. The tissue samples were therefore stored at the EPA's Mississippi test facility pending the gathering of further data through the new dioxin monitoring program. Before the trial in this case had concluded, however, Dr. Patrick W. O'Keefe (a member of the Harvard University team participating in the EPA's current monitoring program) reanalyzed seven of the 1973–74 samples, using improved analytical methods. Dr. O'Keefe's tests confirmed the accuracy of the earlier results. The failure of the 1976–77 EIS to mention the tissue samples taken from the Siuslaw National Forest is another example of the inadequacies of that document, particularly in view of the scientific concern which had been expressed about the bioaccumulation of TCDD even before 1974.

A final example of the inadequacy of the 1976–77 EIS in its discussion of the potential effects of phenoxy herbicides is its complete omission of any reference to the controversy over the effects of Agent Orange in Vietnam. The earlier EISs had at least mentioned that controversy (although they dismissed any suggestion that studies in Vietnam indicated possible health hazards).[59] Several distinguished scientists testified during the trial of this case that significant findings had been made about the effects of Agent Orange. Professor Westing testified that he made four trips to Vietnam between 1969 and 1973 as a member of the Herbicide Assessment Commission of the American Association for the Advancement of Science (AAAS). Tests made by Professor Westing and his colleagues on food fish samples revealed an average dioxin concentration of 540 ppt, with the range being 18 to 814 ppt. A report of these results in April, 1973, stated that dioxin "may have accumulated to biologically significant levels in food chains in some areas of South Vietnam exposed to herbicide spraying."[60] In inspecting the records of several hospitals in Vietnam, members of the AAAS Commission noted an increased incidence of stillbirths and birth defects, although no conclusive findings could be made.[61] Professor Meselson, another member of the AAAS Commission, found TCDD levels of up to 40–50 ppt in human milk samples collected in 1970. Samples collected in 1973 still showed TCDD, though at lower levels. Professor Meselson's results were later confirmed by Dr. O'Keefe using improved analytical techniques.[62] A second major study on the effects of Agent Orange in Vietnam was issued in 1974 by the National Academy of Sciences (NAS). Two members of the NAS committee which prepared the report—Professors Michael Newton and Fred H. Tschirley—testified on behalf of the defendants. Both witnesses stated their opinion that the conclusions in the NAS report were not significant with respect to the Forest Service's herbicide program, chiefly because the rates of application and levels of TCDD contamination of the 2,4,5–T used in Viet-

**59.** 1974–75 EIS, pp. 48–49; 1975–76 EIS, p. 18.

**60.** "Herbicides: AAAS Study Finds Dioxin in Vietnamese Fish", 189 *Science* 285, 286 (Apr. 20, 1973) (attached to Rebuttal Testimony of Dr. John Noell).

**61.** The pertinent portions of Professor Westing's testimony are found at pages 2–6 of his written statement.

**62.** The pertinent portions of Dr. O'Keefe's testimony are found at pages 4–5 of his initial written statement and pages 26–28 of the trial transcript.

nam were much higher.[63] Professor Streisinger, one of plaintiffs' witnesses, pointed out, however, that the differences between dosages in Vietnam and those used in the Siuslaw National Forest were far less than Professors Newton and Tschirley indicated.[64] More important, Professor Streisinger introduced into evidence a copy of the portion of the NAS report dealing with the effects of Agent Orange upon humans.[65] Although conclusive findings could not be made because of insufficient data, the report stated:

"The reports of serious deleterious consequences of herbicide spraying on humans, animals, and plants are internally consistent. At a minimum, they indicate an association in the minds of the Highlanders between the use of herbicides and harmful effects to themselves, their animals and plants, and their environment. Reports of human illness following spraying are so striking it is difficult to dismiss them as simply the effects of propaganda, high normal death rates, or faulty understanding of cause and effect." NAS Report, p. VII-66.

The failure of the 1976–77 EIS to mention the Vietnam controversy is unreasonable, particularly when spraying of 2,4,5–T in the Siuslaw National Forest is frequently carried out near the homes and farms of local residents.[66]

■■■■ The evidence summarized above reveals that the 1976–77 EIS fails to acknowledge the extreme toxicity of TCDD or the opinions of scientists about its hazards, to discuss EPA administrative proceedings against 2,4,5–T or the ongoing TCDD residue monitoring program being conducted by the EPA, to report on TCDD levels found in animal specimens taken from the Siuslaw National Forest, or to mention the controversy over the effects of Agent Orange in Vietnam. These are the major, but by no means the only, shortcomings of the EIS in its discussion of the potential effects of phenoxy herbicides upon human and animal health.[67] Under the standards imposed upon federal agencies by NEPA, these deficiencies together render the EIS inadequate. It should be noted, however, that the deficiencies listed deal almost exclusively with the failure of

63. Professor Newton's testimony is found at pages 18–19 of his written statement and pages 329–330 and 340–343 of the transcript. Professor Tschirley's testimony is found at pages 3–4 of his written statement (an article on defoliation in Vietnam written by him is also attached to his statement).

64. Redirect and Rebuttal Testimony of Professor George Streisinger, pp. 2–3; Rebuttal Testimony of Professor George Streisinger, pp. 1–3 and Appendix 1. See also Plaintiffs' Exhibit 8, discussed by Dr. O'Keefe in his testimony at page 27 of the transcript.

65. Appendix 1 of the Redirect and Rebuttal Testimony of Professor George Streisinger.

66. Several local residents testified that they had suffered physical symptoms similar to those reported in Vietnam. See the written statements of William and Susan Gilbert, Mike Vernon Hankins, Renee Schmidt, Darlene Townsend, and Stevens and Carolyn Van Strum.

67. For example, the current EIS fails to acknowledge the physical effects which have been observed in industrial workers exposed to 2,4,5–T. See Defendants' Exhibit K, pp. 124–125; Statement of Professor Frank N. Dost, p.

3, and Tr. 159–168; Statement of Professor Ted A. Loomis, pp. 2–3; Rebuttal Testimony of Dr. Wilbur P. McNulty, Jr., pp. 2–3. The EIS also does not mention recent research indicating that 2,4,5–T itself (not just the TCDD contained in it) may be teratogenic. See Proposed Testimony of Professor George Streisinger, pp. 11–12; Statement of Dr. Theodor D. Sterling, p. 2, and attached report on 2,4,5–T teratology study in mice at the National Center for Toxicological Research; testimony of Dr. Ralph T. Ross, Tr. 262. The EIS discusses only very briefly (1976–77 EIS, p. 33) the possibility that 2,4,5–T may be converted into TCDD when treated vegetation is burned following spraying. See Statement of Professor Arthur W. Galston, p. 3; Statement of Dr. Patrick W. O'Keefe, pp. 7–9, and Tr. 215–219; Proposed Testimony of Professor George Streisinger, p. 5; Statement of Professor Arthur H. Westing, p. 8; Statement of Professor Frank N. Dost, pp. 9–10; Statement of Dr. Ronald E. Stewart, pp. 15–16. The 1976–77 EIS (pp. 61, 109, 115), like the prior EIS (1975–76 EIS, pp. 2, 18, 20, 21–22), incorrectly states that the level of TCDD in 2,4,5–T is restricted by law when in fact the level is controlled only by voluntary agreement among the manufacturers. See testimony of Dr. Ralph T. Ross, Tr. 283.

the EIS to discuss TCDD-related hazards. For this reason, the plaintiffs should be granted relief only with repsect to TCDD-contaminated phenoxy herbicides. The herbicides 2,4,5–T and silvex contain TCDD, but the herbicide 2,4–D does not.

## B. ADEQUACY OF THE CONSIDERATION OF ALTERNATIVES

NEPA requires that every EIS contain a detailed statement on alternatives to the proposed federal action.[68] The CEQ Guidelines explain this requirement in the following language:

"A rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects, is essential. Sufficient analysis of such alternatives and their environmental benefits, costs and risks should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might enhance environmental quality or have less detrimental effects. . . . In each case, the analysis should be sufficiently detailed to reveal the agency's comparative evaluation of the environmental benefits, costs and risks of the proposed action and each reasonable alternative." 40 C.F.R. § 1500.8(a)(4) (1976).[69]

The purpose of the NEPA requirement for a discussion of alternatives to the proposed federal action is twofold: "to assure that alternatives are explored in the initial decision-making process and to provide an opportunity to those removed from that process also to evaluate the alternatives." Trout Unlimited, supra, 509 F.2d at 1286. In order to accomplish these objectives, the discussion of alternatives " 'must go beyond mere assertions' and provide sufficient data and reasoning to enable a reader to evaluate the analysis and conclusions and to comment on the EIS." Natural Resources Defense Council, Inc. v. Callaway, 524 F.2d 79, 93 (2d Cir. 1975). A detailed and careful analysis of the relative merits and demerits of the proposed action and possible alternatives is of such importance in the NEPA scheme that it has been described as the "linchpin" of the EIS. Id. at 92. For this reason, the discussion of alternatives must be undertaken in good faith; it is not to be employed to justify a decision already reached. Citizens Against the Destruction of Napa v. Lynn, 391 F.Supp. 1188, 1195 (N.D.Cal.1975).

One question which may be raised under NEPA is whether an EIS considers a sufficiently broad range of alternatives. As noted in Life of the Land v. Brinegar, supra, 485 F.2d at 472,

"NEPA's 'alternatives' discussion is subject to a construction of reasonableness. N.R.D.C., Inc. v. Morton, supra [148 U.S.App.D.C. 5], 458 F.2d [827] at 834. . . . [T]here is no need for an EIS to consider an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative. Id. at 834. Rather, the EIS need only set forth those alternatives 'sufficient to permit a reasoned choice.' Id. at 836."

An alternative may not be disregarded merely because it does not offer a complete solution to the problem. Natural Resources Defense Council, Inc. v. Morton, 148 U.S. App.D.C. 5, 458 F.2d 827, 836 (1972).

A second question which may be raised is whether, assuming all reasonable alternatives have been considered, the discussion of those alternatives is adequate. The CEQ Guidelines[70] require the discussion to be straightforward, compact, and comprehensible. Natural Resources Defense Council, Inc. v. Callaway, supra, 524 F.2d at 93. Essentially, the EIS must balance the benefits and environmental costs

---

68. 42 U.S.C. § 4332(2)(C)(iii), set out at page 921, supra.

69. The Forest Service Guidelines are similar. 39 Fed.Reg. 38252, § 8412.5(6) (1974).

70. 40 C.F.R. § 1500.8(b) (1976).

of the proposed action and each reasonable alternative and then determine which course of action has the best net balance.[71] A formal, mathematical cost-benefit analysis is not necessary, however. *Trout Unlimited v. Morton, supra,* 509 F.2d at 1286. The content and scope of the discussion depends, of course, upon the nature of the proposal which is the subject of the EIS. *Natural Resources Defense Council, Inc. v. Callaway, supra,* 524 F.2d at 93.

■ The challenge made by the plaintiffs to the 1976–77 EIS is not to the range of alternatives considered but to the adequacy of the discussion of those alternatives:

"The crucial issue when reviewing these discussions is whether they represent a good faith examination of available alternatives. While plaintiffs do not challenge the range of alternatives considered (except for the need to discuss the practicality of different techniques used in combination), plaintiffs do question the seriousness with which they were prepared. A good faith examination should possess two attributes. First, it should provide sufficient detail to allow a decisionmaker using the document to make a sound choice. Second, it should be clear, accurate and straightforward. Defendants' EIS possesses neither characteristic." Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment and Trial Brief, p. 33.

Specifically, the plaintiffs charge

1. That the discussion of alternatives to the herbicide program is far too brief;

2. That the EIS cites no studies demonstrating that the use of herbicides results in long-term net gains in productivity;

3. That regional differences in the effectiveness of various alternatives are not discussed;

4. That conclusions about the net benefits of herbicide use are invalid because underlying calculations are distorted;

5. That studies supporting the value of vegetation management in general are cited to support the value of management with herbicides; and

6. That the figures provided in the EIS overstate the cost of mechanical and manual methods of vegetation control and understate the cost of herbicide use.

The portions of the 1976–77 EIS which are pertinent to these claims by the plaintiffs may be found at pages 17–19 (relative costs of various methods of vegetation control), 68–70 (benefits of vegetation management), and 90–96 (alternatives to the proposed action, including fire, mechanical and manual methods, biological control, and no treatment). After reviewing these pages and the evidence introduced in this case,[72] I have concluded that the EIS does not adequately discuss possible alternatives to the proposed use of phenoxy herbicides within the Siuslaw National Forest.

Some of the deficiencies of the EIS are apparent merely from reading the document itself. The discussion of alternatives at pages 90–96 consists essentially of one generality after another. The section on fire, for example, simply lists eight advantages and seven disadvantages to its use. The section on biological control appears to be almost totally irrelevant to problems of site preparation and release of conifers, even though these are the chief purposes for which herbicides are employed. Al-

---

**71.** As stated in *Natural Resources Defense Council, Inc. v. Morton, supra,* 458 F.2d at 833, the EIS must provide a basis for "(a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action." See also, CEQ Guidelines, 40 C.F.R. § 1500.8(a)(4) (1976), set out at page 933, *supra.*

**72.** Testimony relating to the EIS's discussion of alternatives included that of Gerald Mackie (Direct and Rebuttal Testimony of Gerald Mackie, pp. 1–23), Professor Michael Newton (Statement of Professor Michael Newton, pp. 5–12), and Dr. Ronald E. Stewart (Statement of Dr. Ronald E. Stewart, pp. 6–9 and attached manuscript).

though the section on no treatment states that this alternative will be "seriously considered" for all herbicide-use projects, it is then abruptly dismissed as unacceptable for management of timberlands. This portion of the EIS consists largely of the "mere assertions" which are inadequate under NEPA. *Natural Resources Defense Council, Inc. v. Callaway, supra,* 524 F.2d at 93.

Nowhere except at pages 17–19 does the discussion of alternatives to use of herbicides employ specific data. The testimony of the defendants' own witness establishes, however, that the figures which are provided on average cost/acre of various methods of vegetation management are highly misleading or totally incorrect. The table on page 18 shows an average cost/acre of $20 for release of conifers by herbicides and $150 for hand release. Thomas C. Turpin, Silviculturist for the Siuslaw National Forest, testified, however, that the average cost of conifer release using herbicides is actually $50/acre, with actual costs ranging from $35 to $60.[73] He also acknowledged that the $150/acre cost of hand release might apply to a "very extreme" unit but that the cost for hand release of a more typical unit would be in the range of $70–$80/acre.[74] Gerald Mackie, president of Hoedads, Inc. (whose members perform contract labor in the Forest), estimated an average cost for hand release of $60/acre.[75] These inaccuracies in the cost figures presented in the EIS are substantial and would undoubtedly influence a decision-maker relying upon that document.

The 1976–77 EIS contains no discussion of the relative effectiveness of herbicides and other methods of vegetation control in enhancing long-term productivity. It provides no data on the acreage now being treated by each method. It does not discuss possible combinations of the different methods employed for vegetation management or possible variations in methods based on geographic or other differences between National Forests. It does not indicate

whether other herbicides may be substituted for the ones recommended or provide information on how effective such substitutes might be. In short, the EIS does not rigorously explore or objectively evaluate the proposed herbicide program and the alternatives to it. It cannot, therefore, serve adequately either those who must employ it to make decisions about vegetation management in the National Forests or those outside the decision-making process who wish to evaluate the alternatives.

The plaintiffs' NEPA claim is directed only at that portion of the Forest Service's vegetation management program in the Siuslaw National Forest which employs phenoxy herbicides. The plaintiffs have not sought to enjoin the use of any other herbicides. The widest scope of relief which would be appropriate because of the EIS's inadequate discussion of alternatives would therefore be an injunction against use of all phenoxy herbicides in the Forest until such time as an adequate EIS has been prepared.

■ My conclusion that the alternatives discussion is inadequate is inseparable, however, from my conclusion that the EIS does not adequately address the health issues presented by TCDD-contaminated phenoxy herbicides. The failure to explore and evaluate in greater detail the alternatives to the use of phenoxy herbicides assumes importance largely because the potential environmental risks of TCDD have not been considered in balancing the net benefits of phenoxy herbicides versus other methods of vegetation control. For this reason, I find that the Forest Service should be enjoined only from the use of TCDD-contaminated herbicides in the Forest pending the completion of an adequate EIS.

### C. COMMENTS OF GOVERNMENT AGENCIES AND THE PUBLIC

■ The final NEPA claim raised by the plaintiffs is that the defendants failed

**73.** Deposition of Thomas C. Turpin, pp. 99–100, 120.

**74.** *Id.* at pp. 103–105.

**75.** Direct and Rebuttal Testimony of Gerald Mackie, pp. 10–11.

to follow statutory procedures for obtaining and considering the comments of other government agencies and of the public on the proposed EIS. I have concluded that this claim is without merit except insofar as the Forest Service failed to respond adequately to comments about the potential hazards of phenoxy herbicides. The latter deficiency has already been addressed by this opinion.

The portion of 42 U.S.C. § 4332(2)(c) which is pertinent to this claim provides that, before issuing a final EIS, the responsible federal official

"shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes".

The policy statement contained in the CEQ Guidelines states with respect to this process that

"Federal agencies shall: (1) Provide for circulation of draft environmental statements to other Federal, State, and local agencies and for their availability to the public in accordance with the provisions of these guidelines; (2) consider the comments of the agencies and the public; and (3) issue final environmental impact statements responsive to the comments received." 40 C.F.R. § 1500.2(b) (1976).

Other portions of the CEQ Guidelines contain the following directives:

1. That agencies develop procedures to afford timely information to the public about federal programs with environmental impact (including an early notice system for informing the public of the decision to prepare a draft EIS); [76]

2. That draft EISs be prepared and circulated as early as possible in the agency review process and satisfy to the fullest extent possible the requirements for final EISs; [77]

3. That federal agencies having special expertise with respect to any environmental impact involved be contacted; [78]

4. That EPA review be obtained whenever an agency action relates to air or water quality, pesticide regulation, or other subjects within EPA authority; [79]

5. That agencies facilitate comments by the public by announcing the availability of draft EISs and making copies of them available to those who request an opportunity to comment or who are known to be interested in the agency's activities; [80]

6. That governmental agencies and the public be afforded not less than 45 days to provide their comments; [81]

7. That any opposing professional views and responsible opinion overlooked in the draft EIS and brought to the agency's attention through the commenting process should be considered and meaningfully responded to in the final EIS; [82]

8. That all substantive comments received on the draft EIS should be attached to the final EIS and all agencies and persons making such

---

[76]. CEQ Guidelines, 40 C.F.R. § 1500.6(e) (1976).

[77]. Id., § 1500.7(a).

[78]. Id., § 1500.9(a)(1) (specific agencies and their relevant areas of expertise are identified in Appendices II and III to the Guidelines).

[79]. Id., § 1500.9(b).

[80]. Id., § 1500.9(d).

[81]. Id., § 1500.9(f).

[82]. Id., § 1500.10(a).

comments be provided with a copy of the final EIS;[83]

9. That the agency take no administrative action subject to NEPA sooner than 90 days after a draft EIS has been circulated or 30 days after a final EIS has been made available;[84]

10. That the agency make the EIS, the comments received and any underlying documents available to the public at the head and appropriate regional offices of the agency and at appropriate state and areawide clearinghouses.[85]

The Forest Service Guidelines are similar but provide a time limit for comment of not less than 60 days[86] (15 days more than the minimum required by the CEQ Guidelines) and also require that the decision reached following completion of the EIS process be publicly announced through appropriate means.[87]

The procedures followed by the Forest Service in preparing and circulating the 1976–77 EIS[88] substantially complied with the requirements of NEPA and of the CEQ and Forest Service Guidelines. A draft EIS was distributed on September 16, 1975, to some 29 federal agencies; 23 state agencies (including offices acting as clearinghouses for the state) in Washington, Oregon, and California; local agencies in a total of 60 counties in the three states; and 110 private groups. Copies of the draft EIS were made available for review by interested individuals at the offices of the Chief of the Forest Service and the Regional Forester, at the Forest Supervisor's Office and Ranger District Offices of each National Forest in Oregon and Washington, and at 73 public libraries. The Regional Forester issued a release on September 26, 1975, announcing the issuance of the draft and giving the deadline for submission of comments. Comments received by December 10, 1975, were considered by the Forest Service. Responses to all comments received, as well as copies of the comments themselves, were included in the final EIS. All persons who provided comments were furnished with a copy of the final EIS. The Regional Forester announced his decision to proceed with the herbicide program on April 12, 1976, approximately two months after the final EIS was made available. A news release was issued by the Siuslaw National Forest before spraying began within the Forest.[89]

The plaintiffs contend that the Forest Service's commenting procedures were inadequate in two respects: unavailability of the documents to be reviewed and improper handling of comments once received.[90] Two witnesses testified that they experienced difficulty in locating copies of the EIS at various places.[91] The president of Hoedads, Inc. testified that no EIS had ever been distributed to his organization for its comments.[92] The plaintiffs also pointed out that the 1976–77 EIS did not include all the text of the comments of one environmental group[93] or attempt to incorporate governmental agency comments which had been

83. *Id.*, § 1500.10(a), (b).

84. *Id.*, § 1500.11(b).

85. *Id.*, § 1500.11(d).

86. 39 Fed.Reg. 38255, § 8413.4 (1974).

87. *Id.*, § 8413.5.

88. The manner in which the EIS was prepared and issued is described at pages 920–921, *supra.*

89. See 1976–77 EIS, pp. ii–ix, 96–125, Appendix D; Defendants' Exhibit B; Statement of David A. Graham, p. 9, Attachments 5 and 6.

90. Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment and Trial Brief, p. 41.

91. Statement of Mel Erickson; Statement of Stevens and Carolyn Van Strum, p. 9.

92. Direct and Rebuttal Testimony of Gerald Mackie, p. 22.

93. A letter from Dr. David Hanson dated November 18, 1975 (Plaintiffs' Exhibit 9), which should have been included in Appendix D of the EIS with the letter from the Washington Environmental Council (p. D–17), was omitted from the EIS.

received the prior year but not included in that EIS.[94]

The defendants submitted testimony in rebuttal of some of these charges.[95] The other alleged deficiencies in the Forest Service's procedures for obtaining and considering comments are insubstantial or involve steps not required by NEPA.

## THE EAGLES ACT CLAIM

The Act for the Protection of Bald and Golden Eagles, 16 U.S.C. §§ 668 et seq., provides both criminal and civil penalties for specified acts which harm bald or golden eagles.[96] The prohibited acts include poisoning, molesting, or disturbing these eagles.[97]

Although the Eagles Act does not expressly confer a right of action upon private citizens, the plaintiffs ask this court to recognize an implied civil remedy for violations of its provisions. They claim that the requirements of Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), for implication of a private civil remedy have been satisfied.[98] In the alternative, they contend that they are entitled to sue even without satisfying those requirements because the relief they seek is against a federal agency and is limited to declaratory and injunctive, rather than monetary, relief.[99]

**94.** The plaintiffs point to Exhibits 5, 8, and 9 to the Deposition of Thomas C. Turpin.

**95.** See the statements of Robert J. Bartholomew, John R. Nesbitt, Steven L. Sorseth, James P. Warner, and Donald C. Wood with respect to the availability of EISs at the Ranger District Offices within the Siuslaw National Forest.

**96.** The criminal section, 16 U.S.C. § 668(a), provides in pertinent part as follows:
"(a) Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in sections 668 to 668d of this title, shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles . . . shall be fined not more that $5,000 or imprisoned not more than one year or both . . . ."
The language of the civil section, 16 U.S.C. § 668(b), is similar except with respect to the intent element:
"(b) Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in sections 668 to 668d of this title, shall take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle, commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles . . . may be assessed a civil penalty by the Secretary [of the Interior] of not more than $5,000 for each such violation. . . . ."

**97.** The word "take" as used in § 668(a) and (b) is defined to include "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, or molest or disturb". 16 U.S.C. § 668c.

**98.** For a thorough discussion of the requirements for implication of a private civil remedy, see Miller v. Mallery, 410 F.Supp. 1283, 1287–1290 (D.Or.1976), appeal pending.

**99.** Although the plaintiffs have not cited it, a statute recently enacted by Congress may be relevant to the latter contention. That statute broadens federal question jurisdiction (28 U.S.C. § 1331(a)) by eliminating the $10,000 minimum requirement in actions brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity. Act of Oct. 21, 1976, Pub.L. No. 94–574, § 2, 90 Stat. 2721. The statute also amends the Administrative Procedure Act (5 U.S.C. § 702) to provide that a plaintiff seeking other than money damages because of a federal official's action or failure to act shall not be denied relief on the ground of sovereign immunity (although relief may be denied on any other appropriate legal or equitable ground). Id., § 1. The Supreme Court has recently noted that no jurisdictional basis existed for judicial review of many federal agency actions before the new statute was enacted. Califano v. Sanders, —— U.S. ——, —— ——, 97 S.Ct. 980, 983–985, 51 L.Ed.2d 192 (1977).
I need not decide whether the statutory changes now afford the plaintiffs a jurisdictional basis for review of Forest Service actions. Even if the new statute entitles them to sue for the relief they desire without regard to the requirements of Cort v. Ash, and even if the plaintiffs could overcome the possible barrier of lack of standing, the outcome on their Eagles Act claim would be no different. As noted below, the evidence fails to establish that the Act has been violated.

I need not decide whether a remedy is available to the plaintiffs under the Eagles Act. Even assuming that a remedy is available with respect to eagles located within the Siuslaw National Forest, the plaintiffs would not be entitled to the relief sought because they have not established that any violation of the Eagles Act has occurred.

The plaintiffs argue that the evidence introduced in this case [100] establishes that bald and golden eagles are present in the Siuslaw National Forest, that these eagles are likely to feed in areas which have been subjected to spraying with phenoxy herbicides, and that accumulations of TCDD within fish and animals upon which they prey are harmful to them. In fact, however, the evidence shows that the defendants do not spray within one-quarter mile of any of the known or suspected nesting sites of bald or golden eagles. Moreover, although there is some evidence that TCDD may have accumulated in species upon which eagles prey,[101] there is absolutely no evidence that any particular eagle has suffered injury as a result of such accumulation or even that any eagle has been exposed to significant amounts of TCDD. Under these circumstances, I cannot find that the defendants have violated the Eagles Act.

## CONCLUSION

Although the plaintiffs have failed to establish the alleged violation of the Eagles Act, they have succeeded in proving that the defendants have violated NEPA in two respects. Insofar as the 1976–77 EIS covers the use of phenoxy herbicides in the Siuslaw National Forest, that document inadequately discusses the potential environmental effects of TCDD-contaminated herbicides and the alternatives to their use.

For the reasons set forth in this opinion, the plaintiffs are entitled to a judgment declaring that the 1976–77 EIS prepared by the defendants on vegetation management with herbicides in the Siuslaw National Forest is legally inadequate because it fails to satisfy the requirements of NEPA. Further, the plaintiffs are entitled to a permanent injunction enjoining further applications of the TCDD-contaminated herbicides 2,4,5–T and silvex in the Siuslaw National Forest unless and until the defendants have properly remedied the defects in this EIS. This court shall retain jurisdiction of this proceeding until an adequate EIS has been prepared, circulated, and filed.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### APPENDIX A

Plaintiffs' Witness Statements

Professor Virgil C. Boekelheide
Professor William C. Denison
Mel Erickson
Diane E. Fritz
Dr. Bruce P. Gaber
Professor Arthur W. Galston
William and Susan Gilbert
Sayre N. Greenfield
Mike Vernon Hankins
Professor Steven George Herman
Dr. Eloise W. Kailin
Dr. Granville F. Knight
* Gerald Mackie
* Dr. Wilbur P. McNulty, Jr.
* Dr. John Noell
* Dr. Patrick W. O'Keefe
 Alberto Palleroni
 Wayne E. Rifer
 Renee Schmidt
 Stan E. Sherwood
* Dr. Theodor D. Sterling
** Professor George Streisinger
 Darlene Townsend
* Stevens and Carolyn Van Strum
 Professor Arthur H. Westing
 Larry Williams

Silovsky appears at pages 59–79 of the trial transcript.

---

100. Testimony relating to the Eagles Act claim included the written statements of Diane E. Fritz, Sayre N. Greenfield, Professor Steven George Herman, Alberto Palleroni, Wayne E. Rifer (with attachments), and Gene D. Silovsky (with attachments). Cross-examination of Mr.

101. See the discussion at pages 930–931, *supra*, of animal specimens taken from the Siuslaw National Forest in 1973–74 which were found to contain TCDD residues.

<u>Defendants' Witness Statements</u>

Robert J. Bartholomew
Kendall N. Covert
Professor Frank N. Dost
David A. Graham
John O. Hoffman
Dr. Philip C. Kearney
Professor Theodore P. Kistner
Professor Ted A. Loomis
John R. Nesbitt ·
Professor Michael Newton
Dr. Logan A. Norris
* Dr. Ralph T. Ross
Gene D. Silovsky
Steven L. Sorseth
Lavell O. Stanger
Dr. Ronald E. Stewart
Harold R. Sturgis, Jr.
Professor Fred H. Tschirley
Thomas C. Turpin
James P. Warner
Professor James M. Witt
Janet L. Wold
Donald C. Wood

<u>Intervenor's Witness Statements</u>

Dr. Warren B. Crummett·
John Davidson
Professor Boysie E. Day
Dr. William H. Lawrence
Dr. Bernard A. Schwetz

\* Two statements filed.
\*\* Three statements filed.